# PIERCE, GOVERNOR OF OREGON, ET AL. *v.* SOCIETY OF SISTERS.

# PIERCE, GOVERNOR OF OREGON, ET AL. *v.* HILL MILITARY ACADEMY.

APPEALS FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE DISTRICT OF OREGON.

Nos. 583, 584.  Argued March 16, 17, 1925.—Decided June 1, 1925.

1. The fundamental theory of liberty upon which all governments of this Union rest excludes any general power of the State to standardize its children by forcing them to accept instruction from public teachers only.  P. 535.
2. The Oregon Compulsory Education Act (Oreg. Ls., § 5259) which, with certain exemptions, requires every parent, guardian or other person having control of a child between the ages of eight and sixteen years to send him to the public school in the district where he resides, for the period during which the school is held for the current year, is an unreasonable interference with the liberty of the parents and guardians to direct the upbringing of the children, and in that respect violates the Fourteenth Amendment.  P. 534.
3. In a proper sense, it is true that corporations can not claim for themselves the liberty guaranteed by the Fourteenth Amendment, and, in general, no person in any business has such an interest in possible customers as to enable him to restrain exercise of proper power by the State upon the ground that he will be deprived of patronage;
4. But where corporations owning and conducting schools are threatened with destruction of their business and property through the improper and unconstitutional compulsion exercised by this statute upon parents and guardians, their interest is direct and immediate and entitles them to protection by injunction.  *Truax v. Raich*, 239 U. S. 33.  P. 535.
5. The Act, being intended to have general application, can not be construed in its application to such corporations as an exercise of power to amend their charters.  *Berea College v. Kentucky,* 211 U. S. 45.  P. 535.
6. Where the injury threatened by an unconstitutional statute is present and real before the statute is to be effective, and will

become irreparable if relief be postponed to that time, a suit to restrain future enforcement of the statute is not premature.   P. 536.

296 Fed. 928, affirmed.

APPEALS from decrees of the District Court granting preliminary injunctions restraining the Governor, and other officials, of the State of Oregon from threatening or attempting to enforce an amendment to the school law,—an initiative measure adopted by the people November 7, 1922, to become effective in 1926—requiring parents and others having control of young children to send them to the primary schools of the State. The plaintiffs were two Oregon corporations, owning and conducting schools.

*Mr. Willis S. Moore,* Assistant Attorney General of Oregon, with whom *Mr. I. H. Van Winkle,* Attorney General, was on the brief, for appellant Van Winkle.

The Fourteenth Amendment does not remove or restrict the power of the State to enact laws necessary to promote the health, safety, peace, morals, education or general welfare of its people. *Munn* v. *People of Illinois,* 94 U. S. 278; *Boston Beer Co.* v. *Massachusetts,* 97 U. S. 25; *Barbier* v. *Connolly,* 113 U. S. 27, 31; *Mugler* v. *Kansas,* 123 U. S. 623, 666; *Powell* v. *Pennsylvania,* 127 U. S. 678; *Re Kemmler,* 136 U. S. 436, 449; *Crowley* v. *Christensen,* 137 U. S. 86; *Jones* v. *Brim,* 165 U. S. 180, 182; *Jacobson* v. *Massachusetts,* 197 U. S. 11; *Interstate Consol. Street R. Co.* v. *Massachusetts,* 207 U. S. 79; *McLean* v. *Arkansas,* 211 U. S. 539; *Middleton* v. *Texas Power & L. Co.,* 249 U. S. 152; *N. O. Gas Light Co.* v. *Louisiana Light, etc., Mfg. Co.,* 115 U. S. 650; *Slaughter House Cases,* 16 Wall. 22; *Stone* v. *Mississippi,* 101 U. S. 814; *Sanitary District of Chicago* v. *United States,* 266 U. S. 405.

The provisions of a corporation charter and of any law pursuant to which a corporation may have entered into

valid contracts, are subject to modification and annulment under the police power. *Boston Beer Co.* v. *Massachusetts, supra; Stone* v. *Mississippi, supra; The Mayor, etc.* v. *Miln,* 11 Pet. 102; *Eagle Insurance Co.* v. *Ohio,* 153 U. S. 449; *Chicago B. & Q. Co.* v. *Nebraska,* 170 U. S. 59; *Pacific Gas & E. Co.* v. *Police Court,* 251 U. S. 22; *Thornton* v. *Duffy,* 254 U. S. 361; *Chicago L. Ins. Co.* v. *Needles,* 113 U. S. 574.

As to minors, the State stands in the position of *parens patriae* and may exercise unlimited supervision and control over their contracts, occupation and conduct, and the liberty and right of those who assume to deal with them. *State* v. *Shorey,* 48 Ore. 396; *Stettler* v. *O'Hara,* 69 Ore. 519; *State* v. *Bunting,* 71 Ore. 259; *Gibbons* v. *Gibbons,* 75 Ore. 500; *Merges* v. *Merges,* 94 Ore. 246; *State* v. *Bailey,* 157 Ind. 324; *Sturges & Burn Mfg. Co.* v. *Beauchamp,* 231 U. S. 320; *Muller* v. *Oregon,* 208 U. S. 412; *Starnes* v. *Albion Mfg. Co.* 147 N. C. 566; *People* v. *Ewer,* 141 N. Y. 129; *Berea College* v. *Commonwealth,* 123 Ky. 209; *State* v. *Jackson,* 71 N. H. 552; *Commonwealth* v. *Roberts,* 159 Mass. 372; *State* v. *Counort,* 69 Wash. 321; *Meyer* v. *Nebraska,* 262 U. S. 390; *In re Turner,* 49 Kan. 115; *Vanwalters* v. *Board of Children's Guardians,* 132 Ind. 567; *State* v. *Rose,* 125 La. 462; *Ex parte Powell,* 6 Okla. Cr. Pr. 495; *Egoff* v. *Board of Children's Guardians,* 170 Ind. 238; *United States* v. *Behrendsohn,* 197 Fed. 953; *Interstate Company* v. *Massachusetts,* 207 U. S. 79.

The statute does not interfere with religious liberty. *Permoli* v. *New Orleans,* 3 How. 589; *Brunswick Co.* v. *Evans,* 228 Fed. 991; *People* v. *Board of Education,* 245 Ill. 335; *Swafford* v. *Keaton,* 23 Ga. App. 238; *State* v. *Mockus,* 113 Atl. 39 (Me.); *Reynolds* v. *United States,* 98 U. S. 145; *Commonwealth* v. *Herr,* 229 Pa. St. 132; *Owens* v. *State,* 6 Okla. Cr. 110; *People* v. *Pierson,* 176 N. Y. 201; *Scales* v. *State,* 47 Ark. 476; *Commonwealth*

v. *Has*, 122 Mass. 40; *Philips* v. *Gratz*, 2 Pen. & W. 412; *Wilkes-Barre* v. *Garabed*, 11 Pa. Super. 355; *Smith* v. *People*, 51 Colo. 270.

The American people as a whole have unalterably determined that there shall be an absolute and unequivocal separation of church and state, and that the public schools shall be maintained and conducted free from influences in favor of any religious organization, sect, creed or belief. Art. I, Const. U. S.; Art. I, § 5, Oregon Const.; Art. VIII, § 3, *Id.*; *Knowlton* v. *Baumhover*, 182 Iowa 691; *Wilkerson* v. *Rome*, 152 Ga. 762; *Evans* v. *Selma Union High School District* (Cal., 1924), 222 Pac. 801; *Donahoe* v. *Richards*, 38 Me. 379.

The provisions of subdivision " d " of the act conferring upon county superintendents power to determine that a child is not being properly taught and to order him sent to a public school, do not invalidate the measure, but relate to a proper exercise of administrative power. The fact that the amendment to § 5259, Oregon Laws, contains new provisions in conflict with a succeeding section of the act, which was not amended, does not invalidate the amendment.

*Mr. William D. Guthrie*, with whom *Mr. Bernard Hershkopf* was on the brief, for appellee in No. 583.

This bill establishes a case of irreparable injury imminent to the appellee's business and property. *International News Service* v. *Associated Press*, 248 U. S. 215, 236; *Springhead Spinning Co.* v. *Riley*, L. R. 6 Eq. 551, 558; *Vicksburg Waterworks Co.* v. *Vicksburg*, 185 U. S. 65, 82; *Terrace* v. *Thompson*, 263 U. S. 197; *Walla Walla* v. *Walla Walla Water Co.*, 172 U. S. 1; *School of Magnetic Healing* v. *McAnnulty*, 187 U. S. 94; *Kennington* v. *Palmer*, 255 U. S. 100.

Courts of the United States have jurisdiction because a federal constitutional right of the plaintiff-appellee was

invaded by the enactment in question. If the liberty of parents be unconstitutionally impaired by the enactment in suit, surely it must needs follow, by the same token and with irresistible logic, that the constitutional rights of the appellee are likewise directly and unconstitutionally abridged. *Truax* v. *Raich,* 239 U. S. 33, 38; *Nebraska District* v. *McKelvie,* 262 U. S. 404; *Terrace* v. *Thompson,* 263 U. S. 197, 215–6; *Packard* v. *Banton,* 264 U. S. 140, 143.

The enactment in suit is not a legitimate exercise of the police power of the State. The courts are entrusted with authority, and it becomes their solemn duty, to review the reasonableness and propriety of any attempted use of that power. *Child Labor Tax Case,* 259 U. S. 20, 37. This Court, like the court below, must know that the true purpose of the act, as well as its plain and intended practical effect, was the destruction of private primary, preparatory and parochial schools; for they certainly could not survive the denial of the right of parents to have their children thus educated in the primary grades. Such drastic and extraordinary legislation is a portentous innovation in America. Private and religious schools have existed in this country from the earliest times. Indeed, the public or common school, as we know it today, dates only from 1840. For generations all Americans—including those who fought for liberty and independence in the eighteenth century, and who drafted the Declaration of Independence, the Northwest Ordinance of 1787, and the Constitution of the United States—were educated in private or religious schools, and mostly the latter. Perhaps no institution is older or a more intimate part of our colonial and national life than religious schools and colleges, both Catholic and Protestant. The private and religious schools have been the laboratories in which educational methods have been worked out and pedagogic progress accomplished from

the very beginning of our history. Out of them have developed, or to 'them is due, our greatest colleges and universities, the most important of them to this day being private or religious institutions. In more recent times commonwealth colleges and universities have grown up. The legislation before the court manifestly carries within itself a threat, not merely to the private elementary and preparatory schools which it now practically proscribes, but to every private or religious preparatory school and every private or religious college or university in the land. The statute in suit is so unusual and extraordinary that it must arouse misgivings in the judicial mind upon even the slightest reflection. More than ever must it be borne in mind in judging it, as pointed out by the Chief Justice in *Wolff Co.* v. *Industrial Court,* 262 U. S. 522, 534, that "restraints must not be arbitrary or unreasonable. Freedom is the general rule, and restraint the exception."

The statute abridges the freedom of four classes closely interrelated: (1) the freedom of the private and parochial schools, (2) the freedom of teachers engaged in those schools, (3) the freedom of parents and guardians, and (4) the freedom of children. There is nothing in the record which warrants even the suggestion that private and parochial schools in Oregon are in any respect inferior to the public schools. If, however, the contrary were the fact, the case would still be no different; for there would still not exist any valid reason for their total suppression. The State of Oregon has regulatory power adequate to every reasonable and proper need in this relation. Indeed, it has largely exercised it as its statutes demonstrate.

In the brief submitted on behalf of the appellant Governor, it is urged in justification for the enactment that it was necessary in order to prevent the teaching of disloyalty and subversive radicalism or bolshevism. Assuming, therefore, but only for the purposes of the argu-

ment, that there may be in fact such an evil as this appellant conjures up and that it is not a mere chimera, nevertheless, there is no reasonable necessity for any such prohibitory law as is now under discussion. This Court has emphatically held that the States have power to make criminal and forbid the teaching of disloyalty, sedition, or pacifism. *Gilbert v. Minnesota*, 254 U. S. 325. It has also declared " that this court and other courts have decided that a license or certificate may be required of a , . . school teacher." *Lehmann v. Board of Accountancy*, 263 U. S. 394, 398; *People v. American Socialist Society*, 202 N. Y. App. Div. 640.

Where regulation is so completely adequate, prohibition is unnecessary and constitutes mere arbitrariness and wanton abuse of power. Particularly must this be true, where the subject of the alleged prohibition is an ordinary, innocuous and useful calling, trade, or business. However the matter may stand as to nuisances and businesses tainted with vicious qualities, tendencies, or effects, there is no doubt that this Court has repeatedly and authoritatively refused to countenance destruction of honest and ordinary businesses charged with abuses which were readily remediable by regulation. *Adams v. Tanner*, 244 U. S. 590; *Meyer v. Nebraska*, 262 U. S. 390; *Nebraska District of Evangelical Lutheran Synod v. McKelvie*, Id. 404, 410. See *Hamilton v. Vaughn*, 179 N. W. 553, 558 (Mich.); *Columbia Trust Co. v. Lincoln Institute*, 138 Ky. 804, 812–4.

That the assimilation of the foreigner is not a justification for any such prohibitory statute, was expressly decided in *Meyer v. Nebraska*, 262 U. S. 390, 402. But the fact is, that the whole contention is fallacious and merely a far-fetched extravagance or pretense. Oregon has no substantial unnaturalized immigrant problem. Eighty-five per cent of its population is native-born. Half of the remainder is naturalized and presumably Americanized.

Of the children of the seven and a half per cent. unnaturalized, only a small number attend private schools. The children of poor, ignorant foreigners do not attend private schools where tuition must be paid for; they generally go to the free public schools. The public school is not a "melting pot." Schools are, and obviously must be, located in given districts. If the neighborhood be American, the school there will have a similar character. If, however, it be situated in a poor and foreign quarter, the school will be attended almost entirely by children of the poorer class of foreigners. The child of a foreigner is quite as likely to be assimilated and Americanized in a private or parochial school as in a public school. But there was no claim that as a matter of fact and truth American history and the aims of our Governments were not being correctly taught in the private and parochial schools of the State, nor was there any suggestion that the children attending such schools were not being properly or adequately instructed in any fundamental principles of freedom and democracy or in reverence and righteousness. The private and parochial schools teach the same subjects as the public schools—whatever one does to inculcate and foster patriotism, the other can and does do quite as well.

No legislation can proscribe social discrimination, and the statute in the case at bar is singularly inappropriate to that end. Young children do not discriminate against each other; that is a characteristic of maturity. The picking and choosing of friends for reasons based upon money, creed, or social status come, not during elementary school days, but afterwards; and no force thus far vouchsafed to man has ever been equal to the destruction or elimination of social distinctions. How the act in suit could accomplish that result, no one can tell; and, as a reason for annihilating the appellee's useful and honorable business, it amounts to nothing. It is now intimated

that the statute was necessary in order to effectuate compulsory education. But the suggestion is clearly based upon false premises. The notion that private and public schools cannot exist in peace and harmony side by side, which underlies the act in suit, is not only contradicted by long experience, but is probably held by no competent educator.

Thus far we have considered the enactment in suit only in reference to the rights of the private and parochial schools and the teachers they employ. But there is involved in the case at bar a far more important group of individual rights, namely, the rights of the parents and guardians who desire to send their children to such schools, and the rights of the children themselves. Reflection should soon convince the court that those rights, which the statute seriously abridges and impairs, are of the very essence of personal liberty and freedom. *Tillman* v. *Tillman,* 26 L. R. A. (n. s.) 781, 785 (S. Car.). In this day and under our civilization, the child of man is his parent's child and not the State's. "Take away from the parents all care and concern for their children's education, and you make a social life an impossible and unintelligible notion." Pufendorf's Law of Nature and Nations, book VI, c. II, § 4. It need, therefore, not excite our wonder that to-day no country holds parenthood in so slight esteem as did Plato or the Spartans—except Soviet Russia.

It is not seriously debatable that the parental right to guide one's child intellectually and religiously is a most substantial part of the liberty and freedom of the parent. *Meyer* v. *Nebraska,* 262 U. S. 390, 399–400; *Taylor* v. *Beckham (No. 1),* 178 U. S. 548, 602–3. See also *Wolff Co.* v. *Industrial Court,* 262 U. S. 522, 534; *Coppage* v. *Kansas,* 236 U. S. 1, 10, 14; *Smith* v. *Texas,* 233 U. S. 630, 636; *People* v. *Gillson,* 109 N. Y. 389, 398–9; *Tillman* v. *Tillman,* 26 L. R. A. (n. s.) 781, 785 (S. Car.).

The statute in suit trespasses, not only upon the liberty of the parents individually, but upon their liberty collectively as well. It forbids them, as a body, to support private and parochial schools and thus give to their children such education and religious training as the parents may see fit, subject to the valid regulations of the State. In that respect the enactment violates the public policy of the State of Oregon and the liberty which parents have heretofore enjoyed in that State. *Liggett* v. *Ladd,* 17 Ore. 89, 94. See also *Milwaukee Industrial School* v. *Superiors,* 40 Wis. 328, 332; *People* v. *Turner,* 55 Ill. 280; *State ex rel. Sheibley* v. *School District,* 31 Neb. 552, 556; *Trustees* v. *People,* 87 Ill. 303. In whatever light the act in suit be regarded, it must be manifest that, in the end, it embodies the pernicious policy of state monopoly of education.

The legislative power of a State in relation to education does not involve the power to prohibit or suppress private schools and colleges. The familiar statement that education is a public function means no more than that it is a function that the State may undertake, because it vitally interests and concerns the State that children shall be furnished the means of education and not left to grow up in ignorance. But the power of the State to provide public schools carries with it no power to prohibit and suppress private schools and colleges which are competent and qualified to afford what the State wants, namely, education. Thus, there is no question as to the power of the State to construct and operate public roads, bridges and other means of transportation; yet it would hardly be seriously contended that the State might under the police power forbid the further operation of all private highways, bridges and railroads. Whenever the State desires the use of any such existing facilities for some distinctly public purpose, it can take them only by the exercise of the power of eminent domain. *Los Angeles*

v. *Los Angeles Gas & Electric Corporation*, 251 U. S. 32, 38; *Green* v. *Frazier*, 253 U. S. 233; *Adams* v. *Tanner*, 244 U. S. 590.

The present case is wholly outside the principle that, where a State may enter upon an undertaking which can be conducted profitably and satisfactorily only as a monopoly, it may prevent competition or the continued use of competing facilities by condemning and destroying property under the power of eminent domain and just compensation. In its essence, the Oregon law is one strangling scientific investigation in private laboratories. The social interests menaced by the suppression of private educational institutions and the denial of liberty to pursue long rooted habits and traditions among our people are peculiarly of the character that the Fourteenth Amendment was most immediately designed to protect from state political action. *Laurel Hill Cemetery* v. *San Francisco*, 216 U. S. 358, 366. The Fourteenth Amendment had for its primary object the prevention of state legislation calculated to keep one class in subjection to another in respect of opportunities for economic and social advancement, the pursuit of happiness, and the exercise of fundamental rights comprehended in an essential individual liberty, among men fit for freedom. *Buchanan* v. *Warley*, 245 U. S. 60; *Meyer* v. *Nebraska*, 262 U. S. 390; *Bartels* v. *Iowa*, 262 U. S. 404.

The statute impairs the obligation of the contract embodied in the appellee's corporate charter. *Dartmouth College case*, 4 Wheat. 518. The corporation laws under which the appellee exists as a corporation (Deady's Code, 1886, pp. 632–4, as amended by General Laws of Oregon for 1903, pp. 176–7) do not contain any provision empowering the State to alter, amend, or repeal the charter; and the constitutional provision which was in force in Oregon when the appellee was organized (§ 2, Art. XI), while permitting the corporation laws of the State to be

altered, amended, or repealed, nevertheless, expressly limited that power by providing that it was not to be exercised " so as to impair or destroy any vested corporate rights." In *Liggett* v. *Ladd*, 17 Ore. 89; *Lornsten* v. *Union Fishermen's Co.*, 71 Ore. 540, it was held that a corporation had a vested right to its corporate name which subsequent legislation could not impair. If that be so, *a fortiori* the right granted to the plaintiff-appellee upon its incorporation to maintain and conduct schools for pay, is likewise a vested right within the meaning of the Oregon constitutional provision above referred to; and, as such, may not be impaired or destroyed by the legislature. The enactment in suit is, consequently, void, not only because of this provision of the Oregon constitution, but also because it impairs the obligation of a contract in violation of section 10 of Article I of the Constitution of the United States. *Berea College* v. *Kentucky*, 211 U. S. 45, distinguished.

*Mr. J. P. Kavanaugh,* with whom *Messrs. Jay Bowerman, Dan J. Malarkey, Hall S. Lusk, E. B. Seabrook* and *F. J. Lonergan* were on the brief, for appellee in No. 583.

*Messrs. George E. Chamberlain* and *Albert H. Putney,* with whom *Mr. P. Q. Nyce* was on the brief, for the Governor of Oregon.

The assertion that this law impairs the obligation of contracts is clearly disposed of by *Berea College* v. *Kentucky,* 211 U. S. 45. A State cannot contract away any of its fundamental governmental powers.

It is now definitely settled that the Fourteenth Amendment did not radically alter the relations between the federal and state governments, or make the provisions of the Bill of Rights in the United States Constitution binding upon the state governments.

The charge that the statute violates the privileges and immunities of citizens of the United States is hardly

worthy of serious consideration. *Slaughter House Cases,* 16 Wall. 36; *Twining* v. *New Jersey,* 211 U. S. 78; *Hodges* v. *United States,* 203 U. S. 1; *Hudson County Water Co.* v. *McCarter,* 209 U. S. 349; *Corfield* v. *Coryell,* 4 Wash. 371; *Eadleigh* v. *Newhall,* 136 Fed. 941.

The statute does not deprive anyone of property without due process of law. *Mugler* v. *Kansas,* 123 U. S. 623; *Kidd* v. *Pearson,* 128 U. S. 1; *Clark Distilling Co.* v. *Western Maryland R. Co.,* 242 U. S. 311; *Crane* v. *Campbell,* 245 U. S. 304. The principle of the non-liability of government for loss to business incidentally resulting from state legislation is not confined to business similar to the liquor traffic. *Madera Waterworks* v. *City of Madera,* 228 U. S. 454; *Hadacheck* v. *Sebastian,* 239 U. S. 394; *Tanner* v. *Little,* 240 U. S. 369; *Hebe Company* v. *Shaw,* 248 U. S. 297; *Purity Extract and Tonic Co.* v. *Lynch,* 226 U. S. 192.

Cases in which this Court has protected the right to labor, are not precedents in this case. There is a great distinction between the right to work and the right to have a private business protected as against public competition or the exercise of the police powers of the State.

In *Terrace* v. *Thompson,* 264 U. S. 197, it was held that " The quality and allegiance of those who own, occupy and use the farm lands within its borders are matters of highest importance and affect the safety and power of the State itself." Is " the safety and power of the State " less effected by the control of education than by the control of farm lands?

This Court has never held that there was a denial of due process of law where a private business was injured or even destroyed by state competition in a field in which a State might lawfully engage. If a State may engage at all in any field, the question of the effect of state competition upon private business is immaterial. The owners of private schools have even less basis for the claim that

their property is taken without due process of law through the enactment of a compulsory education law than the owners of property used for saloon purposes had when their business was interfered with by a state prohibition law.  In the latter case the entire use of the property for the purpose for which it was intended was prohibited; in the former case the school is only deprived of certain prospective students.  A private school might still be continued for students under or over the age limits set by the law.  A properly qualified teacher in a private school might easily secure a position as one of the additional teachers who would be required by the public schools.  No person in any business has such an interest in possible customers as to enable him to restrain the government from exercising any proper power because it might deprive him of such patronage.  To state such a contention is to show its absurdity.

The case of the Hill Military Academy is no stronger under the law, than would have been the case of a merchant who had attempted to restrain the operation of the draft act, during the recent war, on the ground that the Government, by taking away certain of his customers, was depriving him of his property without due process of law.  See *Munn* v. *Illinois,* 94 U. S. 113.

The Oregon law does not deprive any person of liberty without due process of law.  The appellees are corporations.  The liberty protected by the Fourteenth Amendment is that of natural, and not of artificial, persons. *Northwestern Nat. L. Ins. Co.* v. *Riggs,* 203 U. S. 243, 255; *Western Turf Ass'n.* v. *Greenberg,* 204 U. S. 359, 363.  Nor can the appellees claim to have any such interests in the liberties of the school children of the State, or their parents.  No person has the right to test the constitutionality of a law merely because it may affect the liberty of another person in whom he has no recognized legal interest. *Gusman* v. *Marrero,* 180 U. S. 81. *Truax* v. *Raich,* 239 U. S. 33, distinguished.

No claim can arise that the school children themselves
are deprived, by this law, of liberty without due process
of law.   It will be admitted by all that children under
sixteen years of age cannot be given liberty of choice as to
their education; this must be under the control either of
the State, or of their parents, or of both the State and
their parents.   If any persons have been deprived of
liberty without due process of law it is the parents of the
school children.   The determination of this last point
brings us to the question of the respective authority of
the State and of parents over minor children.

Even in the freest country no person can possess
absolutely uncontrolled liberty, either with respect to
himself personally, or to his children.   A parent cannot
have a more complete right of control over the actions
of his child than over his own actions.   Liberty of all is
subject to reasonable conditions deemed essential by the
governing body to the safety, health, peace, good order
and morals of the community.   *Crawley* v. *Christensen*,
137 U. S. 86; *Jacobson* v. *Massachusetts*, 197 U. S. 11.

Under all governments, even those which are the most
free and democratic in their character, the citizen must
always owe duties to the State; and it necessarily follows
that the State has an interest in making it certain (which
can only be done by appropriate legislation) that the
citizen is fitted, both in mind and body, to perform these
duties.   *Jacobson* v. *Massachusetts, supra.*   The discre-
tionary powers of a State are broad enough to permit it
to decide that compulsory attendance at public schools
is a proper " precautionary measure against the moral
pestilence of paupers, vagabonds, and possibly convicts."
*Mayor, etc. of New York* v. *Miln*, 11 Pet. 102.

The voters of Oregon who adopted this law had the
right to act on the belief that the fact that the great
increase in juvenile crime in the United States followed
so closely after the great increase in the number of chil-

dren in the United States who were not attending public schools, was more than a coincidence. The voters in Oregon might also have based their action in adopting this law upon the alarm which they felt at the rising tide of religious suspicions in this country, and upon their belief that the basic cause of such religious feelings was the separation of children along religious lines during the most susceptible years of their lives, with the inevitable awakening of a consciousness of separation, and a distrust and suspicion of those from whom they were so carefully guarded. The voters of Oregon might have felt that the mingling together, during a portion of their education, of the children of all races and sects, might be the best safeguard against future internal dissentions and consequent weakening of the community against foreign dangers.

In *Mayor, etc. of New York* v. *Miln, supra,* this Court was considering the evil effects upon a State of the immigration of ignorant foreigners, unacquainted with, and lacking sympathy with, American institutions and ideals. In this connection, it should be remembered that the vast majority of children not now attending the public schools of Oregon who will be compelled to do so by the new statute, are either themselves immigrants or the children of immigrants. Surely a State can require of all immigrants admitted to the advantages and opportunities of life in the United States, that their children shall be taught by the State the English language, and the character of American institutions and government. *Meyer* v. *Nebraska,* 262 U. S. 390, distinguished.

The compulsory attendance of all children of school age at the public schools during the relatively short hours during which these schools are in session would not deprive the parents of any just rights. There would remain an abundance of time and opportunity for supplementary instruction either in religion or in the language, history, and traditions of the land of their ancestors. The ob-

jectionable feature about the Nebraska law was that it
forbade the teaching of modern languages either in regu-
lar schools or in supplementary schools. The dicta in
the *Meyer Case* would appear to be somewhat broader
than can be supported by the previous decisions of this
Court which are cited to support it.

The subject of immigration is one which is exclusively
under the control of the Central Government. The
States have nothing to say as to the number or class of
the immigrants who may be permitted to settle within
their limits. It would therefore appear to be both unjust
and unreasonable to prevent them from taking the steps
which each may deem necessary and proper for American-
izing its new immigrants and developing them into
patriotic and law-abiding citizens. At present, the vast
majority of the private schools in the country are con-
ducted by members of some particular religious belief.
They may be followed, however, by those organized and
controlled by believers in certain economic doctrines en-
tirely destructive of the fundamentals of our govern-
ment. Can it be contended that there is no way in
which a State can prevent the entire education of a con-
siderable portion of its future citizens being controlled
and conducted by bolshevists, syndicalists and com-
munists?

The exact question involved in the present case has
never been passed upon by any American court. Per-
haps the cases which come nearest are those on whether
the school authorities have the right to exclusive control
over the list of studies to be taken by pupils in the public
schools, or whether the parents have a limited right of
selection. The decisions on this question are in hopeless
conflict. In New Hampshire (*Kidder* v. *Chelis,* 59 N. H.
473) Indiana (*State* v. *Webber,* 108 Ind. 31,) and Iowa
(*State* v. *Mizner,* 50 Ia. 145,) the power of the public is
held exclusive; while in Illinois (*School Trustees* v. *Peo-
ple,* 87 Ill. 303,) Oklahoma (*School Board District* v.

*Thompson,* 24 Okla. 1,) and Wisconsin (*Morrow* v. *Wood,* 35 Wis. 59,) some right of control has been held to belong to the parent. This Court has twice recently, in the child labor cases, (*Hammer* v. *Dagenhart,* 247 U. S. 251, and *Bailey* v. *Drexel Furniture Co.,* 259 U. S. 20,) held that all questions relative to the care, control and custody of minor children belong exclusively to the State.

The Oregon law does not deny the equal protection of the law. The whole opposition arises from the fact that it is intended to bring about a greater equality in the operation of the school law of Oregon than has previously existed. A law which increases the uniformity of the application of a law cannot by any stretch of the imagination be classed as a law which denies the equal protection of the law. The new Oregon School Law merely removes an exception to the generality of the application of the former law. The right to the equal protection of the laws is not denied when it is apparent that the same law or course of procedure is applicable to every other person in the State under similar circumstances and conditions. *Walston* v. *Nevin,* 128 U. S. 582; *Tinsley* v. *Anderson,* 171 U. S. 106; *Williams* v. *Arkansas,* 217 U. S. 79.

If the compulsory school laws of the other States are constitutional, this law must be held so. If a State may pass a law applying to a certain portion of the things or persons included in a general class, it can pass one applying to all in a general class, unless express exceptions are to be found in the prohibitions in the Federal Constitution. *Fisher* v. *St. Louis,* 194 U. S. 361. The constitutionality of the Oregon law can be sustained as an exercise of the police power of the State. The scope of this power is very broad. *Chicago, B. & Q. R. Co.* v. *Illinois,* 200 U. S. 561; *Bacon* v. *Walker,* 204 U. S. 311; *Mayor, etc. of New York* v. *Miln,* 11 Pet. 102. This law may also be sustained under the powers of the State in connection with its duties to aid the United States in time of war. *Arver* v. *United States,* 245 U. S. 366; *Holdman* v. *United States,* 245 U. S.

474; *Ruthenberg* v. *United States,* 245 U. S. 480; *Cox* v. *Wood,* 247 U. S. 3; *Frohwerk* v. *United States,* 249 U. S. 204; *Debs* v. *United States,* 249 U. S. 211; *McKinley* v. *United States,* 249 U. S. 397. The power and duty to be prepared for war is shared by the state government. *Gilbert* v. *Minnesota,* 254 U. S. 325; *Halter* v. *Nebraska,* 205 U. S. 34.

The discretion of the States in the exercise of their powers is broad enough to justify a State in holding that a compulsory system of public school education will encourage the patriotism of its citizens, and train its younger citizens to become more willing and more efficient defenders of the United States in times of public danger. This is particularly true in view of the fact that if the Oregon School Law is declared unconstitutional there will be nothing to prevent the establishment of private schools, the main purpose of which will be to teach disloyalty to the United States, or at least the theory of the moral duty to refuse to aid the United States even in the case of a defensive war. If a State cannot compel certain children to attend the public schools it cannot compel any children to do so. An attempt to do so would be clearly a violation of the "equal protection of the laws" clause of the Fourteenth Amendment.

*Mr. John C. Veatch,* for appellee in No. 584.

Any restrictions upon the rights of the individual are arbitrary and oppressive unless intended to promote the public welfare and having a reasonable relation to that purpose. *Purity Extract Co.* v. *Lynch,* 226 U. S. 192; *McLean* v. *Arkansas,* 211 U. S. 539. Where the legislative action is arbitrary and has no reasonable relation to a purpose which it is competent for the Government to effect, the legislature transcends the limits of its power in interfering with the liberty of contract. *C. B. & Q. R. R. Co.* v. *McGuire,* 219 U. S. 549; *Atlantic Coast Line* v. *Goldboro,* 232 U. S. 559; *House* v. *Mayes,* 219 U. S. 270; *Reduction Company* v. *Sanitary Works,* 199 U. S.

306; *C. B. & Q. R. R. Co.* v. *Drainage Commissioners,* 200 U. S. 561; *Lochner* v. *New York,* 198 U. S. 45. If it is within the power of the State to take away the business of the private schools in the elementary grades, it is equally within that power to take away their business in all grades. *Adams* v. *Tanner,* 244 U. S. 590.

This act is not designed and intended to promote compulsory education. It adds nothing to the standard of education, it does not broaden the educational field; the changing of the ages for compulsory school attendance is in no way affected by the clause relating to private schools. *Commonwealth* v. *Roberts,* 159 Mass. 372.

While no rule of law defines the limits of the State's power, the principle, based upon the universal decisions of the courts, is that the power shall not interfere with the rights of the individual, unless such interference is necessary to promote the public welfare and the restrictions placed upon the individual's rights have a real, substantial, and direct relation to the object to be accomplished. *Adkins* v. *Childrens Hospital,* 261 U. S. 525; *Truax* v. *Corrigan,* 257 U. S. 312; *Yick Wo* v. *Hopkins,* 118 U. S. 356; *Mugler* v. *Kansas,* 123 U. S. 623.

By special leave of Court briefs of *amici curiae* were filed by *Mr. Louis Marshall* for the American Jewish Committee; *Mr. Wm. A. Williams,* for the North Pacific Union Conference of Seventh Day Adventists; *Messrs. Chas. H. Tuttle, Chas. E. Hotchkiss, Alexander J. Field,* and *Woodson P. Houghton,* for The Domestic and Foreign Missionary Society of the Protestant Episcopal Church in the United States.

MR. JUSTICE MCREYNOLDS delivered the opinion of the Court.

These appeals are from decrees, based upon undenied allegations, which granted preliminary orders restraining

55627°—25——34

appellants from threatening or attempting to enforce the
Compulsory Education Act * adopted November 7, 1922,
under the initiative provision of her Constitution by the
voters of Oregon. Jud. Code, § 266. They present the
same points of law; there are no controverted questions
of fact. Rights said to be guaranteed by the federal
Constitution were specially set up, and appropriate
prayers asked for their protection.

The challenged Act, effective September 1, 1926, re-
quires every parent, guardian or other person having
control or charge or custody of a child between eight and
sixteen years to send him "to a public school for the
period of time a public school shall be held during the
current year" in the district where the child resides; and
failure so to do is declared a misdemeanor. There are

---

*Be it Enacted by the People of the State of Oregon:*

Section 1. That Section 5259, Oregon Laws, be and the same is
hereby amended so as to read as follows:

Sec. 5259. *Children Between the Ages of Eight and Sixteen Years—*
Any parent, guardian or other person in the State of Oregon, having
control or charge or custody of a child under the age of sixteen years
and of the age of eight years or over at the commencement of a term
of public school of the district in which said child resides, who shall
fail or neglect or refuse to send such child to a public school for the
period of time a public school shall be held during the current year
in said district, shall be guilty of a misdemeanor and each day's
failure to send such child to a public school shall constitute a separate
offense; provided, that in the following cases, children shall not be
required to attend public schools:

(a) *Children Physically Unable*—Any child who is abnormal, sub-
normal or physically unable to attend school.

(b) *Children Who Have Completed the Eighth Grade*—Any child
who has completed the eighth grade, in accordance with the pro-
visions of the state course of study.

(c) *Distance from school*—Children between the ages of eight and
ten years, inclusive, whose place of residence is more than one and
one-half miles, and children over ten years of age whose place of
residence is more than three miles, by the nearest traveled road, from
a public school; provided, however, that if transportation to and

exemptions—not specially important here—for children who are not normal, or who have completed the eighth grade, or who reside at considerable distances from any public school, or whose parents or guardians hold special permits from the County Superintendent.   The manifest purpose is to compel general attendance at public schools by normal children, between eight and sixteen, who have not completed the eighth grade.   And without doubt enforcement of the statute would seriously impair, perhaps destroy, the profitable features of appellees' business and greatly diminish the value of their property.

Appellee, the Society of Sisters, is an Oregon corporation, organized in 1880, with power to care for orphans, educate and instruct the youth, establish and maintain academies or schools, and acquire necessary real and per-

---

from school is furnished by the school district, this exemption shall not apply.

(d) *Private Instruction*—Any child who is being taught for a like period of time by the parent or private teacher such subjects as are usually taught in the first eight years in the public school; but before such child can be taught by a parent or a private teacher, such parent or private teacher must receive written permission from the county superintendent, and such permission shall not extend longer than the end of the current school year.   Such child must report to the county school superintendent or some person designated by him at least once every three months and take an examination in the work covered. If, after such examination, the county superintendent shall determine that such child is not being properly taught, then the county superintendent shall order the parent, guardian or other person, to send such child to the public school the remainder of the school year.

If any parent, guardian or other person having control or charge or custody of any child between the ages of eight and sixteen years, shall fail to comply with any provision of this section, he shall be guilty of a misdemeanor, and shall, on conviction thereof, be subject to a fine of not less than $5, nor more than $100, or to imprisonment in the county jail not less than two nor more than thirty days, or by both such fine and imprisonment in the discretion of the court.

This Act shall take effect and be and remain in force from and after the first day of September, 1926.

sonal property. It has long devoted its property and effort to the secular and religious education and care of children, and has acquired the valuable good will of many parents and guardians. It conducts interdependent primary and high schools and junior colleges, and maintains orphanages for the custody and control of children between eight and sixteen. In its primary schools many children between those ages are taught the subjects usually pursued in Oregon public schools during the first eight years. Systematic religious instruction and moral training according to the tenets of the Roman Catholic Church are also regularly provided. All courses of study, both temporal and religious, contemplate continuity of training under appellee's charge; the primary schools are essential to the system and the most profitable. It owns valuable buildings, especially constructed and equipped for school purposes. The business is remunerative—the annual income from primary schools exceeds thirty thousand dollars—and the successful conduct of this requires long time contracts with teachers and parents. The Compulsory Education Act of 1922 has already caused the withdrawal from its schools of children who would otherwise continue, and their income has steadily declined. The appellants, public officers, have proclaimed their purpose strictly to enforce the statute.

After setting out the above facts the Society's bill alleges that the enactment conflicts with the right of parents to choose schools where their children will receive appropriate mental and religious training, the right of the child to influence the parents' choice of a school, the right of schools and teachers therein to engage in a useful business or profession, and is accordingly repugnant to the Constitution and void. And, further, that unless enforcement of the measure is enjoined the corporation's business and property will suffer irreparable injury.

Appellee, Hill Military Academy, is a private corporation organized in 1908 under the laws of Oregon, engaged

in owning, operating and conducting for profit an elementary, college preparatory and military training school for boys between the ages of five and twenty-one years. The average attendance is one hundred, and the annual fees received for each student amount to some eight hundred dollars. The elementary department is divided into eight grades, as in the public schools; the college preparatory department has four grades, similar to those of the public high schools; the courses of study conform to the requirements of the State Board of Education. Military instruction and training are also given, under the supervision of an Army officer. It owns considerable real and personal property; some useful only for school purposes. The business and incident good will are very valuable. In order to conduct its affairs long time contracts must be made for supplies, equipment, teachers and pupils. Appellants, law officers of the State and County, have publicly announced that the Act of November 7, 1922, is valid and have declared their intention to enforce it. By reason of the statute and threat of enforcement appellee's business is being destroyed and its property depreciated; parents and guardians are refusing to make contracts for the future instruction of their sons, and some are being withdrawn.

The Academy's bill states the foregoing facts and then alleges that the challenged Act contravenes the corporation's rights guaranteed by the Fourteenth Amendment and that unless appellants are restrained from proclaiming its validity and threatening to enforce it irreparable injury will result. The prayer is for an appropriate injunction.

No answer was interposed in either cause, and after proper notices they were heard by three judges (Jud. Code § 266) on motions for preliminary injunctions upon the specifically alleged facts. The court ruled that the Fourteenth Amendment guaranteed appellees against the

deprivation of their property without due process of law consequent upon the unlawful interference by appellants with the free choice of patrons, present and prospective. It declared the right to conduct schools was property and that parents and guardians, as a part of their liberty, might direct the education of children by selecting reputable teachers and places. Also, that these schools were not unfit or harmful to the public, and that enforcement of the challenged statute would unlawfully deprive them of patronage and thereby destroy their owners' business and property. Finally, that the threats to enforce the Act would continue to cause irreparable injury; and the suits were not premature.

No question is raised concerning the power of the State reasonably to regulate all schools, to inspect, supervise and examine them, their teachers and pupils; to require that all children of proper age attend some school, that teachers shall be of good moral character and patriotic disposition, that certain studies plainly essential to good citizenship must be taught, and that nothing be taught which is manifestly inimical to the public welfare.

The inevitable practical result of enforcing the Act under consideration would be destruction of appellees' primary schools, and perhaps all other private primary schools for normal children within the State of Oregon. These parties are engaged in a kind of undertaking not inherently harmful, but long regarded as useful and meritorious. Certainly there is nothing in the present records to indicate that they have failed to discharge their obligations to patrons, students or the State. And there are no peculiar circumstances or present emergencies which demand extraordinary measures relative to primary education.

Under the doctrine of *Meyer* v. *Nebraska*, 262 U. S. 390, we think it entirely plain that the Act of 1922 unreasonably interferes with the liberty of parents and guardians to direct the upbringing and education of chil-

dren under their control.  As often heretofore pointed out, rights guaranteed by the Constitution may not be abridged by legislation which has no reasonable relation to some purpose within the competency of the State.  The fundamental theory of liberty upon which all governments in this Union repose excludes any general power of the State to standardize its children by forcing them to accept instruction from public teachers only.  The child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations.

Appellees are corporations and therefore, it is said, they cannot claim for themselves the liberty which the Fourteenth Amendment guarantees.  Accepted in the proper sense, this is true.  *Northwestern Life Ins. Co.* v. *Riggs,* 203 U. S. 243, 255; *Western Turf Association* v. *Greenberg,* 204 U. S. 359, 363.  But they have business and property for which they claim protection.  These are threatened with destruction through the unwarranted compulsion which appellants are exercising over present and prospective patrons of their schools.  And this court has gone very far to protect against loss threatened by such action.  *Truax* v. *Raich,* 239 U. S. 33; *Truax* v. *Corrigan,* 257 U. S. 312; *Terrace* v. *Thompson,* 263 U. S. 197.

The courts of the State have not construed the Act, and we must determine its meaning for ourselves.  Evidently it was expected to have general application and cannot be construed as though merely intended to amend the charters of certain private corporations, as in *Berea College* v. *Kentucky,* 211 U. S. 45.  No argument in favor of such view has been advanced.

Generally it is entirely true, as urged by counsel, that no person in any business has such an interest in possible customers as to enable him to restrain exercise of proper power of the State upon the ground that he will be de-

prived of patronage. But the injunctions here sought are not against the exercise of any *proper* power. Plaintiffs asked protection against arbitrary, unreasonable and unlawful interference with their patrons and the consequent destruction of their business and property. Their interest is clear and immediate, within the rule approved in *Truax* v. *Raich, Truax* v. *Corrigan* and *Terrace* v. *Thompson, supra,* and many other cases where injunctions have issued to protect business enterprises against interference with the freedom of patrons or customers. *Hitchman Coal & Coke Co.* v. *Mitchell,* 245 U. S. 229; *Duplex Printing Press Co.* v. *Deering,* 254 U. S. 443; *American Steel Foundries* v. *Tri-City Central Trades Council,* 257 U. S. 184; *Nebraska District* v. *McKelvie,* 262 U. S. 404; *Truax* v. *Corrigan, supra,* and cases there cited.

The suits were not premature. The injury to appellees was present and very real, not a mere possibility in the remote future. If no relief had been possible prior to the effective date of the Act, the injury would have become irreparable. Prevention of impending injury by unlawful action is a well recognized function of courts of equity.

The decrees below are

*Affirmed.*