In the Matter of the Application of Rose Auster, Petitioner, for a Writ of Habeas Corpus to Determine the Custody of William M. Weberman, an Infant. Myron Weberman, Respondent.

Supreme Court, Special Term, Kings County, September 27, 1950.

*George M. Aronwald* for petitioner.

*Benjamin Weberman* for respondent.

Murphy, J. There are some judicial determinations which so closely touch the hearts and minds of those affected that they assume extraordinary significance. Of such is this decision, for it deals with delicate, sensitive and vital matters, arising out of the care and education of a boy who is the product of a broken home.

The facts are these: The petitioner is the mother of William Mordecai Weberman, now just over seven and a half years old. She seeks his custody in this habeas corpus proceeding. Her former husband is the respondent, as he now has custody of the boy. The petitioner mother and the respondent father were

divorced in 1947, and by an agreement entered into at that time the custody of a younger child, their daughter Barbara, was given to the mother, and that of the aforesaid boy to the father. Both the mother and the father have since remarried. In March of this year this court awarded custody of the daughter to the mother, but this action has little or no bearing on the instant proceeding.

The petitioner mother here seeks custody of her son on the following grounds:

1. That the boy is now enrolled by his father in a Yeshiva (a Jewish parochial school) which is not approved by the Board of Regents of the State of New York or the board of education of the city of New York;

2. That the aforesaid Yeshiva is being maintained in violation of article 17 of the State Education Law and does not include in its curriculum subjects required by said law in article 65;

3. That both the petitioner and the respondent husband are liable to prosecution because of their failure to enroll their son in a school or Yeshiva complying with said State Education Law;

4. That since October, 1949, the father has refused the mother all rights of visitation and that the father wrongfully restrains and detains the boy from seeing his mother and his sister Barbara;

5. That as a result of such alleged detention by the father the son does not have the companionship of other children, which a normal child should have;

6. That the father insists upon the enrollment of the subject son in the aforesaid school because it is almost entirely devoted to the teaching of religion and that he is fearful that said infant, if permitted to be in the custody of his mother, would be brought up as an agnostic or a nonbeliever;

7. That the said infant is clothed by the father in a manner different from that of normal American Orthodox Jewish children and that he wears his hair long (Payas) and is therefore subject to ridicule on the part of other children; and

8. That the father is fanatical in his religious beliefs and insists upon bringing up the said infant in the same fashion.

On the basis of the foregoing charges the mother seeks an order of this court giving her custody of the son. The father's answer substantially denies all of the mother's aforesaid allegations.

Three separate hearings were held by the court in this matter, 316 pages of testimony were taken from nine witnesses, includ- ing the petitioner and the respondent, two Rabbis and two offi-

cials of the city's board of education. Several exhibits were introduced into evidence by each party. Because of the nature of this proceeding and the delicate questions involved the court purposely allowed a wide latitude to both sides in their presentations.

The most vital charge made by the mother is that which states that the boy is not receiving the education required by the New York State Education Law. That law requires that "each minor from seven to sixteen years of age shall attend upon full time day instruction " (Education Law, art. 65, § 3205, subd. 1). The subject boy does not come within any of the exceptions of the aforesaid requirement. The State Education Law also provides that the course of study shall provide for instruction "in at least the eleven common school branches of arithmetic, reading, spelling, writing, the English language, geography, United States history, civics, hygiene, physical training and the history of New York State " (Education Law, art. 65, § 3204, subd. 3).

Subdivision 5 of the aforesaid section was added by the Legislature of 1950 (L. 1950, ch. 135) and provides that a pupil may be excused from the study of health and hygiene by the Board of Regents if such study conflicts with the religion of his parents or guardian.

Section 3204 of the State Education Law also provides that a minor may attend a public school or elsewhere but that the requirements of the section, as quoted above, shall apply to such a minor irrespective of the place of instruction. The section also provides that instruction may be given only by a competent teacher and that English shall be the language of instruction and the text books used shall be written in English. Subdivision 2 of said section provides: " Instruction given to a minor elsewhere than at a public school shall be at least substantially equivalent to the instruction given to minors of like age and attainments at the public schools of the city or district where the minor resides."

Counsel for the respondent, who, incidentally, is respondent's father, conceded at the first hearing that of the eleven basic subjects required to be taught to minors by the State Education Law, only arithmetic is taught at the Yeshiva or school which the subject boy attends. Arithmetic is taught to him only as he learns it from the study of his religious subjects. That means that the lad has no systematic education in reading, spelling, writing, the English language, geography, United States history, civics, hygiene, physical training and the history of the State of New York.

The respondent claims that the Yeshiva which the boy attends is a religious institution, that it does not come within the purview of the State Education Law or the regulations of the board of education of the city of New York; that the court has not the right to require the boy to receive systematic secular education as that is forbidden by the laws of the Jewish Orthodox religion. In this regard the father invokes the provisions of the Constitution of the United States which secures to every citizen of this country the right of religious worship and the freedom to follow the dictates of his conscience in religious matters. As to this constitutional question raised by the respondent father, the court feels that the great weight of authority is to the effect that the State has the power to legislate for the common good. In *Pierce* v. *Society of Sisters* (268 U. S. 510) the court considered an Oregon law which provided that all children must go to public schools and held that this interfered with the fundamental freedom of parents in selecting the type of schools in which their children should be educated. At page 534 the court stated: " No question is raised concerning the power of the State reasonably to regulate all schools, to inspect, supervise and examine them, their teachers and pupils; to require that all children of proper age attend some school, that teachers shall be of good moral character and patriotic disposition, *that certain studies plainly essential to good citizenship must be taught,* and that nothing be taught which is manifestly inimical to the public welfare." (Italics added.) See, also, on this constitutional question *People* v. *Sandstrom* (279 N. Y. 523); *De Lease* v. *Nolan* (185 App. Div. 82); and *People ex rel. Vollmar* v. *Stanley* (81 Col. 276).

It appears to be the plain duty of this court to enforce the provisions of the State Education Law. This law was enacted to protect and to strengthen the youth of our State, to insure the adequate preparation of our children for useful and productive lives, and to set up standards of education which the Legislature, in its wisdom, determined to be the minimum for each minor from seven to sixteen years of age. When this law was enacted, and from time to time since when it was amended, the Legislature of our State was composed of members with various religious backgrounds; some were Orthodox Jews, some were Catholics, some were Protestants. Surely, they intentionally would enact no law which would require a child to receive instruction that would be offensive to his religious belief or the religious belief of his parents; nor would this court condone such a practice were it attempted, for we all personally and col-

lectively cherish the right to practice our respective religions according to the dictates of our consciences and according to our religious teachings.

I do not believe that it is my duty to determine in this case whether or not the Orthodox Jewish law prohibits systematic secular education. Both the petitioner mother and the respondent father are Orthodox Jews, loyal to their faith and its precepts, as they understand them to be. But they disagree on this matter, the mother contending that the Orthodox Jewish law does not forbid systematic secular education; the father claiming that it does. The mother produced two Rabbis as witnesses, both of whom maintained that the Orthodox Jewish law does not forbid systematic secular education. The father, on the other hand, introduced into evidence quotations from profound Jewish theologians which, he contends, prove unequivocally that systematic secular education is prohibited by Orthodox Jewish law.

This phase of the matter, however, is an ecclesiastical question which rightfully belongs to an ecclesiastical tribunal. In fact, the court respectfully suggested that the parties submit this question to a Rabbinical committee, composed of one Rabbi selected by the petitioner, one by the respondent, and one by the court, all to be Rabbis in the Orthodox Jewish faith. The proposal was rejected by the respondent, which, of course, was his civil-law right. Parenthetically, it might be said that both parties to this proceeding state that in the eyes of Orthodox Jewish law it is sinful to have a matter of this kind placed before a civil court.

If, in its wisdom, a Rabbinical committee were to decide that systematic secular education is forbidden by Orthodox Jewish law, then a presentation of such findings could be made to the State Legislature, which, in turn, would undoubtedly give the matter serious consideration in all its aspects. In fact the aforesaid 1950 amendment to the law with respect to the teaching of health and hygiene was passed by the Legislature and approved by the Governor at the instance of the Christian Science Church. This court, however, must interpret and enforce the law as it finds the law to be. Hence I reach the conclusion that the boy, William Mordecai Weberman, must be sent to a school where he will have the education in the subjects required by the State Education Law. There are Yeshivas here in Brooklyn, according to the testimony, which are conducted according to the tenets of Orthodox Jewish law and which Yeshivas also comply with the requirements of the State Edu-

cation Law and the rules and regulations of the Board of Education of the City of New York. In fact, the respondent's father was at one time an active officer of such a Yeshiva.

The testimony of the officials of the board of education of the city of New York, including that of Herman Rosenthal, Esq., as well as the reports of Archie H. Greenberg, acting division supervisor, and Abraham Silverman, the attendance officer, regarding the Yeshiva which the boy attends, leads the court to no other conclusion than that it is not conducted as required by the State Education Law, however sincere its religious training may be.

My decision, therefore, is that if the respondent father wishes to retain custody of his son he must comply with the State Education Law and provide for the boy the systematic secular education in the eleven basic subjects required by said law. If this decision is not complied with within two weeks after the signing of the order to be entered hereon, the custody of the boy will be given to the mother. Meanwhile present visitation arrangements of the boy with his mother shall be continued until modified.

The court will not pass upon the wearing by the child of Payas or long hair, or the matter of his wearing apparel. That is a matter which should be decided by a Rabbinical committee. The court in all sincerity asks both the mother and the father to relieve him of this perplexing burden as it is delicate and theological in nature, and rightly belongs in the realm of the theologians of the Orthodox Jewish faith.

Regarding the other allegations of the mother, they would seem to require no determination because they will be resolved in the process of fulfilling the decision reached above.