DREW, J.
hGeorge Edward Miller pled guilty to three misdemeanor crimes:
• one count of cyberstalking, La. R.S. 14:40.8, for which he received the maximum sentence of one year in jail;
• one count of criminal mischief, La. R.S. 14:59(5), for which he received the maximum sentence of six months in jail; and
• one ’ count of violation of a protective order, La. R.S. 14:79(B)(1), for which he received the maximum sentence of six months in jail.[1]
Pursuant to the guilty pleas, other charges were dismissed. At all pertinent times, the defendant was represented by counsel. All three sentences were ordered to be served consecutively.
Miller appeals only the trial court’s imposition of a Louisiana Uniform Abuse Prevention Order directing Miller to have no contact with his minor child for the remainder of the defendant’s natural life.
We affirm the convictions and sentences, but amend the protective order to reduce to 18 months[2] the term of Miller’s prohibition of no contact with the child, as limited by La. R.S. 46:2136(F).
FACTS
The pertinent facts are clearly set forth in the trial court’s extensive and detailed written reasons for sentencing. We commend the trial court in its diligent and organized sentencing efforts. The trial court specifically noted that this defendant “has an extensive adult criminal history, primarily |2involving physical violence directed toward women with whom he has been involved.”[3]
In sentencing Miller, the trial court reviewed the presentence investigation report, including Miller’s horrific criminal history. The report revealed numerous criminal charges involving violation of protective orders, domestic abuse battery, and harassing telephone calls.
*139 The trial court noted that the Ouachita Parish Sheriff’s Office had received a complaint in January 2011 of a burglary on Huntington Drive at the residence of Mark Sledge, the father of his wife, Danielle. While that investigation was underway, the Sheriffs Office received a call from Miller, who alleged that his wife had told him that someone had broken into his house on Liner Drive. An investigation of Miller’s residence showed no evidence of criminal activity. On the other hand, a door and a flat-screen television were damaged at Sledge’s residence. When deputies contacted him, Sledge advised that Danielle had moved in with him to get away from Miller, and that Miller had harassed all of them. Danielle denied telling Miller that his house was being burglarized. She also produced her cell phone which contained numerous text messages she believed to be from Miller, including death threats against her and members of her family, as well as a compromising picture of her.
Is A search warrant was issued for Miller’s phone records, and those records showed that the number used to place the harassing texts was that of his girlfriend. On the day he made the call to the Ouachi-ta Parish Sheriff’s Office with the false report of a possible break-in at his residence, Miller attempted to call Danielle 90 times between 10:13 a.m. and 4:40 p.m. After the call to the Sheriff’s Office, he called her another 49 times that night and sent 8 text messages. As a result, he was charged with criminal mischief for making a false report of a crime, with cyberstalk-ing, and with the unauthorized entry of an inhabited dwelling.
During the investigation in the burglary on Huntington Drive, Danielle was granted a protective order against Miller. While that order was in effect, she reported receiving phone calls from an unknown number. The calls were made from the phone of a female friend of Miller’s. As a result, Miller was charged with another count of cyberstalking and with the violation of a protective order.
In September 2011, the defendant pled guilty to the three charges outlined above, with the other charges being dismissed as part of the plea agreement. This colloquy occurred on the date of the plea:
BY THE COURT:
You also understand that there would remain in place a protective order. Under the terms of the Louisiana Uniform Abuse Prevention Order you would not be allowed to have any contact with either Danielle Miller or with the child whose date of birth 8-8-05, initials D.E.M. And that would be for the rest of your natural life. Also in the terms and conditions of the protective order — under the terms and conditions of the protective order you would not be able to own or possess a firearm or any ammunition. Now do you understand those terms and conditions?
LBY MR. MILLER:
No, Sir. I don’t understand you said for the rest of my life with who? My son?
BY THE COURT:
Yes, Sir.
BY MR. MILLER:
I can’t take that plea, your Honor.
BY THE COURT:
Alright.
BY MR. ROSS [defense counsel]:
Your Honor, that was not part of the plea. There’s no order in place that prevents him from having any type of contact with his son for the rest of his life.
BY THE COURT:
*140 That might be a condition though I’m outlining to him of my sentence. And he needs to be aware of that.
BY MR. ROSS:
May we approach, your Honor?
BY THE COURT:
Yes, you may approach. And he’s going to need to decide if he’s going to take the plea or not or we just need to set it—
BY MR. ROSS:
I mean, we take the plea, but uh, this has never been a part or in the record where a person has been prohibited from seeing his son for the rest of his life. I know you are saying that’s not an order, but that’s what you could do I know. I’ve heard that indicated in the plea that that would be imposed to a client.
BY THE COURT:
But I need to make him aware that that is a possibility. I’m looking here at eight prior arrests for violation of protective since 2007. Two prior domestic batteries.
BY MR. ROSS:
I can see his wife. But his child.
BY THE COURT:
|-He needs to be aware that’s a possibility. And considering that possibility does he still want to go forward •with the plea?
BY MR. ROSS:
I mean, I don’t want to derail the plea, but I, I think if for a parent to be cut off from a child completely—
BY THE COURT:
He just needs to be aware that when I get my report in, the presentence report and it reveals the history here that is a possibility.
BY MR. ROSS:
Yeah, but there’s no harm done to the child in this case. I understand what the Court is saying, but it somewhat overshadows the rest of the case. Because—
BY THE COURT:
It is a major consideration I would hope in his mind. But to say there’s no harm done to the child — it’s not just the mother who suffers in domestic violence, it’s also the child who’s uprooted from the home and has to deal with this.
BY MR. ROSS:
But we really don’t know since the mother is not on trial what the mother’s done because of it.
BY THE COURT:
That’s why we’re here for a plea. If he doesn’t want to accept that possibility ... That’s just a fact that I have to consider. It may be that there’s a protective order in place where he has supervised visitation with the child. But I’m just saying that he has to be aware that it could be.
BY MR. ROSS:
Yeah, but your court said permanent termination. I can understand supervised visitation.
BY THE COURT:
He needs to understand that’s a possibility. The Court is allowed to consider that to enter any needed orders of protection of that family unit. The mother and the child. And I have to make him fully aware of that. There’s a risk.
IfiBY MR. ROSS:
I understand.
BY MR. MILLER:
I’ll take it, your Honor.
BY THE COURT:
*141 Sir, I want you to be fully aware that that is a possibility. I’m not saying that is what is going to happen. But when I’ve reviewed all the facts of these various cases and history here I need to be aware of what I need to do to protect the family. Mother and child. So you understand that is a risk and that is a factor?
BY MR. MILLER:
Yes, Sir.
BY THE COURT:
That could be entered by this Court as a condition of any sentence. You understand that?
BY MR. MILLER:
Yes, Sir.
At sentencing three months later, the trial court stated:
The Court notes the defendant has demonstrated the inclination toward violence directed against Danielle Miller with whom he shares a child. As provided for by law and required by law the defendant is to have no contact with the victim herein Danielle Miller or the minor child for life.
DISCUSSION
The defendant appeals his lifetime prohibition against contacting his minor son, noting that none of these three misdemeanors provides for permanent termination of parental rights as a sanction for violation.
La. C. Cr. P. art. 881.2(A)(2) prohibits a defendant from appealing a sentence imposed in conformity with a plea agreement. Nonetheless, we are concerned that a trial court cannot, even with the defendant’s initial consent, impose an illegal sentence, especially when the sentence infringes on the | defendant’s basic parental rights. The United States Supreme Court has issued several decisions supportive of parental rights.[4]
We recognize that protective orders can be issued pursuant to the Protection from Family Violence Act, La. R.S. 46:2131, et seq. We note, however, the clear language of La. R.S. 46:2136(F):
Any final protective order or approved consent agreement shall be for a fixed period of time, not to exceed eighteen months, and may be extended by the court, after a contradictory hearing, in its discretion. Such protective order or *142 extension thereof shall be subject to a devolutive appeal only. (Our emphasis.)
Two decades ago, the Fifth Circuit spoke to this issue in Keneker v. Keneker, 579 So.2d 1083, 1085 (La.App. 5th Cir.1991), concluding:
[ T]he Legislature did not contemplate indefinite continuances or extensions of temporary restraining orders and protective orders issued under the Domestic Abuse Assistance laws. Where such an order is to be extended, the extension must be done prior to the expiration of the order; the longest duration for a temporary restraining order is thirty days and for a | ¡protective order is three months. The brevity of these time periods requires frequent review of each situation by the court that issued the order. Further, although C.C.P. art. 8604(A) provides an ordinary temporary restraining order may be extended “for a longer period” with consent of the party against whom it is directed, the Domestic Abuse Assistance laws make no provision for indefinite extension by consent of the parties.
Civil provisions exist providing for the termination of parental rights, and this may be an appropriate disposition in due course, strictly following the legal requirements for such a drastic event.
The narrow question here is whether a trial court can impose at sentencing a lifetime sanction forbidding a parent-child relationship, even after adverting to this potential eventuality at the guilty plea. We share and appreciate the trial court’s concern for the protection of these two victims. We are constrained by La. R.S. 46:2136(F), which limits the duration of an order of protection to a maximum of 18 months.
La. C. Cr. P. art. 882 provides that an illegal sentence may be corrected at any time by the court that imposed the sentence or by an appellate court on review. This we do here.
DECREE
We affirm the defendant’s convictions. We amend the duration of the protective order to 18 months. As amended, we affirm the sentences and conditions of sentences in all respects.
AMENDED, AND AS AMENDED, AFFIRMED.

. Though authorized under each crime, the trial court did not assess any fines or court costs relative to any of these three offenses. Miller’s personal property used in the cyber-stalking crime was seized, impounded and ordered publicly sold, pursuant to La. R.S. 14:40.3(C)(4)(a).

. Subject to future notices, contradictory hearings, and orders of the trial court.

.' The presentence investigation reveals 15 convictions, including six felonies, and a host of other arrests. This dangerous and violent man is the ultimate recidivist, and he has in large part been treated gingerly by the criminal justice system.
The defendant's wife surely told the truth when she testified that: "I didn’t leave him for no other man; I left him because he was a fool.” This would almost be funny, were it not for this criminal’s propensity for drastic and senseless mayhem.

. In Troxel v. Granville, 530 U.S. 57, 65-6, 120 S.Ct. 2054, 2060, 147 L.Ed.2d 49 (2000), the United States Supreme Court stated:
The liberty interest at issue in this case — the interest of parents in the care, custody, and control of their children — is perhaps the oldest of the fundamental liberty interests recognized by this Court. More than 75 years ago, in Meyer v. Nebraska, 262 U.S. 390, 399, 401, 43 S.Ct. 625, 67 L.Ed. 1042 (1923), we held that the "liberty” protected by the Due Process Clause includes the right of parents to “establish a home and bring up children” and "to control the education of their own.” Two years later, in Pierce v. Society of Sisters, 268 U.S. 510, 534-535, 45 S.Ct. 571, 69 L.Ed. 1070 (1925), we again held that the "liberty of parents and guardians” includes the right "to direct the upbringing and education of children under their control.” We explained in Pierce that “[t]he child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations.” Id., at 535, 45 S.Ct. 571. We returned to the subject in Prince v. Massachusetts, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944), and again confirmed that there is a constitutional dimension to the right of parents to direct the upbringing of their children. "It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.” Id., at 166, 64 S.Ct. 438.