NORRIS, Judge.
This is a petition to terminate the parental rights of the mother, JD, with respect to her two minor children, JY and TY. From a judgment granting the relief sought, JD appeals. Finding that the evidence presented does not meet the statutory requisites, we reverse and remand.
The children were taken into the state’s custody on February 3, 1986, upon an investigation of child abuse and an affidavit of Alliece Cole, a child protection worker with the State Department of Health and Human Resources, Division of Children, Youth and Family Services (“Depart *548 ment”). TY, a girl, and JY, a boy, were aged five and six at the time. Ms. Cole’s affidavit, filed February 4, alleged that the children had bruises and welts on their buttocks, and that the mother’s boyfriend, DWB, admitted using a paddle on them as punishment for bringing home “bad grades.” The affidavit also alleged that the house where JD and DWB lived provided “inadequate living conditions” and was filled with drug paraphernalia, which they had instructed the children how to use. It finally alleged that JD and DWB were leaving the children in the care of DWB’s cousin, who has been in and out of mental institutions, used LSD and was recently arrested for indecent exposure. By petition of March 5, the state sought that the children be adjudicated in need of care. Although the Department later claimed that this adjudication was rendered, the record does not show it.
While in a foster home in April 1986, the children began to report incidents of sexual abuse. After an investigation, JD was arrested on two counts of cruelty to juveniles. DWB was also arrested on various charges. JD ultimately pled guilty to one count of indecent behavior with juveniles (and one of middle grade theft, from an unrelated incident). Her sentence of seven years at hard labor was affirmed by this court in an unpublished opinion noted at 520 So.2d 121 (La.App. 2d Cir.1988). In the same proceedings, DWB was sentenced to I8V2 years at hard labor for two counts of attempted cruelty to juveniles and various theft and burglary charges.
In October 1987 the Department filed a petition to terminate JD’s parental rights under LSA-R.S. 13:1601 A and B. The petition alleged that the Department’s objective was to place the children for adoption; their father, Mr. Y, had voluntarily surrendered his rights in June 1987. The petition stated as grounds that JD was “unfit to retain parental control of the said minor children and there is no reasonable expectation of reformation on her part.” The Department also submitted a disposi-tional team conference report which listed the termination of JD’s parental rights as its sole objective.
The court conducted a hearing on May 11, 1988. Ms. Cole, the child protection worker who filed the original affidavit, testified that when she investigated the initial complaint, she found both children to have bruises consistent with paddling. She also investigated the later complaint of sexual abuse, which “was found to be valid.” Deputy Renee Smith testified that she visited JD’s house early in the investigation and saw marijuana and LSD around the home. JD told her that DWB was the children’s principal disciplinarian and had whipped them on occasion but not recently; Dep. Smith did not see any bruises or marks on the children at the time. Pam Futch, a social worker, testified that the children have adjusted well to their foster care. She added that JD had made no effort to visit them, and Ms. Futch could not recommend a visit. Amy Thomas,' another social worker, testified that she had placed the children in foster homes in Lincoln Parish but they experienced so many problems that she had to return them to the Methodist Children’s Home. Over objection, Ms. Thomas said these problems stemmed from the children’s fear that DWB and JD were “coming to get them,” and that the problems had escalated over time. Mary Morris, the social service supervisor, took the stand to say the Department’s position was for terminating JD’s parental rights.
An expert, Dr. Stephenson, also testified for the Department. He examined the children on March 25, 1986, before the charges of sexual abuse had been lodged. Both children told him that DWB had beaten them; TY even reported that DWB once held a gun to her head. Dr. Stephenson said JY had seen “a lot of conflict” and TY had undergone “disturbing experiences” that resulted in adjustment problems and poor performance on IQ tests. Because of their emotional immaturity and problems with interpersonal relationships, he suspected both children had been physically and sexually abused. He added that in terms of emotional disturbance, this was one of the worst cases he had ever seen. He “guessed” the perpetrator of the abuse was a fixated pedophile, for whom there *549 was no real hope of treatment. This is distinguished from a regressed pedophile, who will respond to treatment. On cross examination Dr. Stephenson admitted he could not say that JD was a fixated pedophile; he has never examined her.
JD took the stand. She began by disagreeing with Ms. Futch’s testimony that she had not visited the children; she claimed to have visited them twice after they were taken away, but not since she was arrested. When they visited, the children were not at all fearful of her, though they were fearful of DWB, so he stayed in the car during the visit. A night or so before they were taken away, she had bathed the children and noticed no bruises or marks, but she admitted leaving them with DWB’s cousin for a time right afterward. She denied that she or DWB “beat” the children, but admitted that he had spanked them for getting in bed together or for hiding from the school bus. JD denied any sexual activity with the children either on her part or DWB’s; if there was any sexual abuse, it must have been by DWB’s cousin. She concluded by saying she wanted her children back and would be able to care for them. Until her release from jail, she said her mother could exercise physical custody. On cross examination she admitted that she and DWB had smoked pot and watched pornographic movies in the children’s presence; that DWB hung around with “trashy” people and had been in trouble ever since she knew him. She nevertheless insisted that she had no further contact with him.
After the close of evidence, the trial judge took the case under advisement. By judgment of May 27, 1988, he concluded “the law and evidence is in favor of the state” and terminated JD’s parental rights.
The Department sought to terminate JD’s parental rights by authority of LSA-R.S. 13:1601 A and B, which provide as follows:
§ 1601. Petitioning for the termination of parental rights
The court on its own motion may order that the district attorney petition, or the district attorney in his discretion may petition, for the termination of parental rights of the parent or parents of an abused, neglected, or other child within a juvenile court’s jurisdiction, when the grounds set forth in the petition meet all the conditions of Subsection A, B, C, D, E or F of this Section. * * *
A. (1) The abuse or neglect of the child by the parent or parents results from a crime committed against the person of the child or a crime committed against another child of the parent or parents or when a parent is an accessory to such a crime committed against the person of the child or another child of the parent or parents.
(2) The abuse or neglect of the child by the parent or parents consists of cruel and inhuman treatment which is below a reasonable standard of human decency.
(3) The parent is unfit to retain parental control and there is no reasonable expectation of reformation on the part of the parent or parents.
B. (1) One year has passed since the rendition of an abuse or neglect judgment or child in need of care judgment, as defined in R.S. 13:1600(7), pursuant to the Code of Juvenile Procedure, and in the opinion of the court the parent is unfit to rear the child.
(2) The parent or parents have shown no significant substantial indication of reformation and are unlikely to reform.
In order to support an adjudication of termination under A and B, the evidence must be clear and convincing as to each of the conditions, except for Subsection A(l), for which the evidence must be beyond a reasonable doubt. LSA-R.S. 13:1603 A. A parent’s right to the companionship, care, custody and management of his or her children is fundamental. Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925). Any statute that seeks irrevocably to terminate this right must be construed to give great deference to the parent’s fundamental right; due process must be strictly observed. Lassiter v. Department of Soc. *550 Serv., 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981); State in re Delcuze, 407 So.2d 707 (La.1981); State in Int. of C.P., 463 So.2d 899 (La.App. 2d Cir.1985).
The record is abundantly clear that Subsec. A(l), a crime committed by the parent against the child, was proved beyond a reasonable doubt. The entire record of the criminal proceedings, including the judgment, were admitted at the instant hearing. This satisfies the burden of proof. State in Int. of Miles, 441 So.2d 61 (La.App. 3d Cir.1983); State in Int. of J.D., 494 So.2d 1196 (La.App. 5th Cir.1986).
The evidence as to Subsec. A(2), the abuse or neglect consisted of cruel and inhuman treatment below a reasonable standard of human decency, was clear and convincing. By her guilty plea JD admitted engaging in indecent conduct in the presence of her children.[1] Her overall conduct struck the sentencing judge as “greater than DWB’s because they were of her own flesh and blood and she stood by and never once made any effort to stop it.” Ex., 138.
However, the record does not support a similar finding as to Subsec. A(3), that “there is no reasonable expectation of reformation” on the part of JD. The Department’s dispositional team conference report, which we have closely scrutinized, shows that no effort to rehabilitate or “reform” JD was ever attempted. The Department apparently never considered the possibility of reuniting the children with their mother but pursued the single goal of terminating her parental rights. This does not comport with the basic objectives of statutes for the benefit of children. See, analogously, LSA-C.J.P. arts. 2, 86 A. Moreover, none of the social workers involved in this case ever testified or stated that JD could not be reformed. Only Dr. Stephenson, who guessed the children had been victims of a fixated pedophile, testified that such a wrongdoer was unlikely to respond to treatment; but he could not attribute this diagnosis to JD. The Department’s case is void of any evidence that JD has ever been consulted, counseled or examined by a psychologist.
Perhaps the gravity of her offenses against the children may create an assumption that reformation is not likely. This unaided assumption, however, does not impress us as meeting the burden of clear and convincing evidence, especially in light of other facts in the record. For instance, JD’s PSI (on which the Department relies in brief) suggests that DWB forced her into the abusive situations. PSI, 7. JD’s grandmother stated that JD never abused the children until DWB came around; he abused her and threatened to kill her if she took the children away.[2] The social worker handling the case stated that, “[JD] might not do this again.” PSI, 4. At the instant adjudication hearing, JD testified that she had no further association with DWB. R.p. 104. Regardless of one’s impression of her credibility, these factors create an equally strong assumption that JD was a victim of DWB’s strong and perverse compulsion; separated from his influence, she might not engage in abusive conduct. This evidence is strong enough to undermine the Department’s case, which is built chiefly on con-clusory allegations about the improbability of reformation and on Dr. Stephenson’s supposition that the abuser was a fixated pedophile and could not be successfully treated. The Department’s evidence is not clear and convincing. See also State DHHR in Int. of CAB v. EB, 504 So.2d 162 (La.App. 2d Cir.1987).
Likewise, in order to support an adjudication of termination under Subsec. B, the evidence must be clear and convincing that the parent has shown no significant substantial indication of reformation and is “unlikely to reform.” The evidence on this *551 record does not convince us clearly and convincingly that JD is unlikely to reform.
We are therefore constrained to conclude that the state did not meet its burden of proving by the appropriate evidentiary standard each element of the grounds of termination mandated by either § 1601 A or B. The adjudication must therefore be reversed.
We are nevertheless impressed by the extremely serious abuse alleged and proved in this case and in the prior criminal proceedings. We are not even certain of JD’s current penal status. Under the circumstances it would be inappropriate to remove the children from the Department’s custody and return them to JD or her mother. See State DHHR in Int. of CAB v. EB, supra; see also State in Int. of Brown, 387 So.2d 1366 (La.App. 4th Cir. 1980), writ denied 394 So.2d 615 (La.1980). Because of the failure to meet the burden of proof, this judgment will be reversed and the case remanded to the juvenile (district) court for further proceedings in accordance with law. Custody will remain with the Department pending final adjudication.
The judgment terminating JD’s parental rights is therefore reversed and the case remanded. Costs will not be assessed. LSA-R.S. 13:4521.
REVERSED AND REMANDED.

. JD's Boykin transcript is not included in the record of the criminal case.

. The threats and duress exerted on JD may have forced her into the pattern of abusive conduct. This would be consistent with the "regressed pedophilia” that Dr. Stephenson described and is receptive to treatment or "reform.”