

**FILED**

Nov 30 2016, 5:28 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Valerie K. Boots
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Lyubov Gore
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Sauntio Carter,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

November 30, 2016

Court of Appeals Case No.
49A04-1511-CR-1823

Appeal from the Marion Superior
Court

The Honorable Christina
Klineman, Judge

Trial Court Cause No.
49G17-1508-F6-30930

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellant-Defendant, Sauntio A. Carter (Carter), appeals his conviction for battery resulting in bodily injury, a Class A misdemeanor, Ind. Code § 35-42-2-1(b)(1),(c).

We affirm.

## ISSUE

Carter raises two issues on appeal, which we consolidate and restate as the following single issue: Whether there is sufficient evidence to sustain Carter's conviction for battery resulting in bodily injury.

## FACTS AND PROCEDURAL HISTORY[1]

On August 24, 2015, Carter observed that his fourteen-year-old daughter, M.C., had altered her eyebrows. When Carter questioned M.C. about this, she initially denied that she had made any changes to herself. However, M.C. eventually admitted the truth. As punishment for her dishonesty, Carter confiscated M.C.'s cellphone. After taking possession of M.C.'s cellphone, Carter checked his daughter's social media accounts and was very upset by what he discovered. M.C. had posted photographs of herself wearing only "her panty and bra," and "she was talking to boys, [trying to] . . . like actually offer

---

[1] An oral argument was held in this case on July 25, 2016, at the Indiana Supreme Court courtroom in Indianapolis, Indiana. We thank the attorneys for their excellent advocacy.

herself to them." (Tr. p. 33). In conjunction with these photographs, M.C. had published their address, as well as her grandmother's address, online.

[5] The next day, August 25, 2015, M.C. woke up and readied herself for school while Carter was still asleep. Before walking out the door, M.C. retrieved her cellphone and grabbed a pair of Carter's shoes. When Carter awoke, he discovered that M.C. had taken her cellphone without permission. Carter walked to the bus stop, where he observed M.C. listening to music on her cellphone and wearing his shoes. Carter informed M.C. that she had disrespected him and that they needed to return home "to take [his] shoes off" because his feet are bigger "and she was looking like a clown." (Tr. p. 35).

[6] Although M.C. resisted at first, she eventually heeded Carter's demands to walk home with him. On the way, Carter, who was still upset by the content of M.C.'s social media accounts, broke M.C.'s cellphone. M.C. threatened to run away, to which Carter responded by stating that he would call the police to bring her back. M.C. also responded that she would call the police over her broken phone. When they arrived home, there is no dispute that Carter determined that it was necessary to discipline M.C. However, Carter and M.C. offered varying accounts as to the extent and severity of the punishment.

[7] According to Carter, when they arrived home, Carter instructed M.C. to start cleaning the apartment while he called his father to discuss M.C.'s behavior. While on the phone with his father, Carter was also "telling [M.C.] how she was doing me [*sic*] and how wrong she was what she was doing and I was

telling her the consequences and I told her, that I was going to discipline [her] physically." (Tr. p. 36). Based on the fact that M.C. was fourteen years old, Carter determined that he was "going to discipline her [fourteen] times." (Tr. p. 36). Carter instructed M.C. "to bend over and touch the couch." (Tr. p. 36). Instead, Carter described that M.C. "jumped up off the couch and she raised her hand up at me." (Tr. p. 37). Still on the phone, Carter's father advised him to go take a shower before punishing M.C. so that he would be "level headed." (Tr. p. 37). Carter stated that after he showered, he spanked M.C. fourteen times with his belt.

[8] On the other hand, according to M.C., as soon as they arrived home from the bus stop, Carter directed her "to take off my sweater and everything and my shoes that I had on and stuff. I still had on clothing and stuff and . . . he had told me, he was like bend over the couch." (Tr. p. 7). Carter started hitting her with his belt on her back, legs, and buttocks. She stated that he shoved her against a wall and pressed his forearm across her neck to the point that it was "hard to breathe in air." (Tr. p. 9). After hitting her again with the belt, Carter ordered her to clean the entire apartment. When M.C. finished cleaning, Carter asked her whether she wanted "the whooping now or later" and she "said later." (Tr. p. 10). Carter then showered. When he returned, Carter "hit [M.C.] a couple times" and then had a conversation with her "[a]bout stuff [she] should have did [sic]." (Tr. p. 10). After their conversation, Carter continued with "the rest of this whooping." (Tr. p. 11). Even though M.C. begged for a reprieve of "two second[s]" or "two minutes," Carter told her to

"take it like God did when they beat him." (Tr. p. 11). Also, at one point, M.C. stated that she had balled up her fist, and even though she claimed that she "wasn't going to hit him," Carter saw it and smacked her across the face. (Tr. p. 13). M.C. stated that it hurt when Carter hit her with his belt "because he was hitting [her] with all his force." (Tr. p. 11).

[9] M.C.'s younger brother was home at the time; however, he did not witness any of the punishment. When M.C. returned to school on August 26, 2016, she informed her guidance counselor that her "arm was hurting." (Tr. p. 17). The guidance counselor observed a bruise on M.C.'s shoulder and inquired as to what happened. After gleaning some details of the incident from M.C., the guidance counselor informed the school nurse about the situation and contacted the Indiana Department of Child Services (DCS). The nurse provided M.C. with ice packs to treat her pain. A DCS assessment worker arrived at the school and took photographs of bruises on M.C.'s body, which she opined to be the result of being hit with a belt. M.C. sustained bruises to her buttocks, inner and outer thigh, upper arm, forearm, and lower shoulder.

[10] On August 31, 2015, the State filed an Information, charging Carter with Count I, strangulation, a Level 6 felony, I.C. § 35-42-2-9(b); and Count II, battery resulting in bodily injury, a Class A misdemeanor, I.C. § 35-42-2-1(b)(1),(c). On October 14 and 21, 2015, the trial court conducted a bench trial. At the close of the evidence, the trial court entered a judgment of conviction for battery resulting in bodily injury, a Class A misdemeanor. The trial court found Carter not guilty of strangulation. Immediately thereafter, the trial court

sentenced Carter to 114 days—*i.e.*, his time already served with applicable credit time.

[11] Carter now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Standard of Review*

[12] Carter claims that there is insufficient evidence to uphold his battery conviction. For claims of insufficient evidence, our standard of review is well-settled. "We neither reweigh the evidence nor judge the credibility of the witnesses. We only consider the evidence most favorable to the judgment and the reasonable inferences to be drawn therefrom. Where there is substantial evidence of probative value to support the judgment, it will not be set aside." *Smith v. State*, 34 N.E.3d 252, 255 (Ind. Ct. App. 2015) (internal citations omitted).

### II. *Sufficiency of the Evidence*

[13] It is well established that "[a] parent has a fundamental liberty interest in maintaining a familial relationship with his or her child." *Willis v. State*, 888 N.E.2d 177, 180 (Ind. 2008). Included within this fundamental liberty interest is "the right of parents 'to direct the upbringing and education of children,' including the use of reasonable or moderate physical force to control behavior." *Id.* (internal citation omitted) (quoting *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 534-35 (1925)). However, the State also "has a powerful interest in preventing and deterring the mistreatment of children[,]" and "the potential for child abuse cannot be taken lightly." *Id.* Thus, prosecutors and courts are left with the

difficult task of determining "when parental use of physical force in disciplining children turns an otherwise law-abiding citizen into a criminal." *Id.*

[14] In order to convict Carter of battery resulting in bodily injury, the State was required to prove that Carter "knowingly or intentionally . . . touche[d] [M.C.] in a rude, insolent, or angry manner," which "result[ed] in bodily injury to [M.C.]" I.C. § 35-42-2-1(b)(1),(c). In this case, Carter asserted the affirmative defense of the parental discipline privilege. Indiana Code section 35-41-3-1 provides that "[a] person is justified in engaging in conduct otherwise prohibited if he has legal authority to do so." Indiana courts have construed this provision "as including reasonable parental discipline that would otherwise constitute battery." *Willis*, 888 N.E.2d at 181. "The defense of parental privilege, like self-defense, is a complete defense. That is to say a valid claim of parental privilege is a legal justification for an otherwise criminal act." *Id.* at 182. "The State may refute a claim of the defense of parental privilege by direct rebuttal or by relying upon the sufficiency of the evidence in its case-in-chief." *Id.* "The decision of whether a claim of parental privilege has been disproved is entrusted to the fact-finder." *Id.*

[15] In order to convict a parent for battery where parental privilege is asserted, "the State must prove that either: (1) the force the parent used was unreasonable or (2) the parent's belief that such force was necessary to control [his or] her child and prevent misconduct was unreasonable." *Id.* (citing Restatement of the Law (Second) Torts, § 147 (1965)). Here, the State does not contest the reasonableness of Carter's *belief* that the use of force was necessary. Rather, the

State maintains that Carter exerted unreasonable force in disciplining M.C., such that the parental privilege is negated.

[16]    While there "are no bright-line rules" as to what is considered "proper and reasonable parental discipline of children[,]" the Indiana Supreme Court has adopted the view that "[a] parent is privileged to apply such reasonable force or to impose such reasonable confinement upon his [or her] child as he [or she] reasonably believes to be necessary for [the child's] proper control, training, or education.'" *Id.* at 181-82 (second and third alterations in original) (quoting Restatement, *supra*, § 147(1)).  In determining the reasonableness of a punishment, the following factors are to be considered and "balanced against each other, giving appropriate weight as the circumstances dictate":

> (a) whether the actor is a parent;
> (b) the age, sex, and physical and mental condition of the child;
> (c) the nature of his offense and his apparent motive;
> (d) the influence of his example upon other children of the same family or group;
> (e) whether the force or confinement is reasonably necessary and appropriate to compel obedience to a proper command;
> (f) whether it is disproportionate to the offense, unnecessarily degrading, or likely to cause serious or permanent harm.

*Id.* at 182 (quoting Restatement, *supra*, § 150).  In addition to this non-exhaustive list of factors, "[t]here may be other factors unique to a particular case that should be taken into consideration.  *Id.*  Similarly, "not all of the listed factors may be relevant or applicable in every case." *Id.*

[17]     On appeal, Carter asserts that the State failed to rebut his parental privilege defense beyond a reasonable doubt, in part, because the evidence establishes that "[t]he force used was reasonable under the *Willis* factors." (Appellant's Br. p. 14). It is not apparent from the record which specific factors—*Willis* or otherwise—the trial court considered in finding Carter guilty of battery. However, looking to the first two *Willis* factors, the evidence establishes that Carter is M.C.'s biological father, and M.C. was fourteen years old at the time of the incident. The trial court noted that M.C., a female, was "as big as" Carter. (Tr. p. 50). The State directs our attention to M.C.'s testimony that she takes anti-anxiety medicine as evidence of her emotional instability.

[18]     Regarding the nature of her offense, M.C. lied to her father about altering her eyebrows, so Carter confiscated M.C.'s cellphone as punishment. It was then that Carter discovered that M.C. had posted inappropriate photographs of herself online and had "offer[ed] herself" for sexual encounters. (Tr. p. 33). M.C. had also provided her address, as well as her grandmother's address, to men on the Internet. When M.C. left for school the following day, she took her cellphone and Carter's shoes without permission. Also, after Carter decided to use his belt and told M.C. to bend over the couch, he observed M.C. "un-balling [her] fist" as though she had planned to strike him. (Tr. p. 13).[2] According to Carter, it was the culmination of M.C.'s "escalating misbehavior

---

[2]  Carter testified that M.C. "jumped up off the couch and she raised her hand up at [him]." (Tr. p. 37). Conversely, M.C. testified that, notwithstanding that she made a fist, she had no intention of actually hitting Carter. (Tr. p. 13).

and disrespect for her father's authority" that resulted in his choice of disciplinary measures. (Appellant's Br. p. 15). As to the influence of M.C.'s example upon other children in the family, no evidence was presented at the trial except that M.C.'s younger brother was in the apartment at the time and did not witness the punishment.

[19] The last two *Willis* factors require an examination of whether the parent's force is reasonably necessary to compel obedience and whether that force is disproportionate to the offense, unnecessarily degrading, or likely to cause serious permanent harm. *Willis*, 888 N.E.2d at 182. A parent "is not privileged to use a means to compel obedience if a less severe method appears to be likely to be equally effective." *Id*. at 183 (quoting Restatement, *supra*, § 150 cmt. d). In this case, Carter argues that, prior to spanking M.C. with his belt, he "used progressive forms of discipline," including confiscating M.C.'s cellphone; asking his mother to speak with M.C.; and requiring M.C. to clean the apartment, which she failed to do in a satisfactory manner. (Appellant's Br. p. 16). According to Carter, none of these disciplinary measures were sufficient to deter M.C.'s misbehavior. Carter acknowledges that he doled out a "painful" punishment, but he maintains that it was an appropriate response as "M.C. was engaging in dangerous activity and [he] saw her defiance and disrespect escalating quickly." (Appellant's Br. p. 17). Carter argues that he "repeatedly took steps to ensure the discipline was not imposed hastily or in anger" such as by walking outside, calling his father, and taking a shower. (Appellant's Br. p. 16). Carter also points out that his punishment was not unnecessarily

degrading because M.C. was fully clothed, and they were "in the privacy of their home." (Appellant's Br. p. 17). As a result of Carter's punishment, M.C. had bruises on her buttocks, inner and outer thigh, upper arm, forearm, and lower shoulder. One day after the whipping, M.C. was sore and was treated with ice packs at school, but there is no evidence that she suffered any serious or permanent harm.

[20] Carter likens his case to *Willis*, 888 N.E.2d at 183, where the supreme court found the parent's punishment of striking her child five to seven times "with either a belt or an extension cord" was reasonable after the mother had previously "used progressive forms of discipline" such as sending the child to his room; grounding him; and withholding television, games, and time spent outdoors, all of which were insufficient to deter the child from committing additional offenses. Furthermore, the supreme court found "nothing particularly degrading" about an eleven-year-old boy receiving "five to seven swats on his buttocks, arm, and thigh for what many parents might reasonably consider a serious offense." *Id.* Even though the swats hurt, the child returned to school the following day without any pain, and despite apparent bruising, "there is no indication that the school nurse provided any medical attention or even suggested that medical attention was necessary." *Id.* at 184.

[21] The State counters that M.C.'s offenses did not merit Carter's "brutal" punishment and argues that Carter should have taken "numerous steps" to punish M.C. instead of hitting her with his belt. (Appellee's Br. p. 15). Because M.C. complied with Carter's demands to return home and clean the apartment

and because she accepted the discipline in a "docile" manner, the State contends that "M.C. was not an errant child who could not be reasoned with." (Appellee's Br. p. 16). The State further asserts that M.C.'s beating "was unnecessarily degrading, particularly because it was not limited to M.C.'s buttocks and back." (Appellee's Br. p. 14). Rather, "M.C. sustained severe bruising to her shoulders, arms, forehead,[3] buttocks, back, and legs." (Appellee's Br. p. 14). The State concedes that the punishment did not lead to any permanent damage but nonetheless contends that Carter "used all of his force" and caused so much pain that M.C. "was unable to sit in school the next day." (Appellee's Br. p. 14).

[22] The State posits that the present case is more akin to *Smith v. State*, 34 N.E.3d 252, 253-54 (Ind. Ct. App. 2015), where a parent beat her thirteen-year-old daughter with two different belts ten to twenty times on her arms, shoulder, and legs. There, as in the present case, the mother discovered that her teenaged daughter "was having conversations with boys on social media sites that were 'very sexual in nature'" among other dangerous behaviors. *Id.* at 253. Prior to whipping her child, the mother imposed a substantial number of progressive disciplinary measures, including withdrawing the child from public school and replacing the child's wardrobe with more modest clothing. *Id.* We found that the parent had inflicted an unreasonable punishment, and in so finding, we

---

[3] State's Exhibits 3 and 15 depict, respectively, the left and right sides of M.C.'s forehead. Neither picture appears to show any bruising. During the trial, M.C. testified that Carter smacked her in the face, but there is no evidence that provides any reason as to why M.C. would have bruises on both sides of her forehead.

emphasized the fact that the mother had "engaged in a fighting match" with her child. *Id.* at 257. The State also relies on *Smith v. State*, 489 N.E.2d 140, 141 (Ind. Ct. App. 1986), wherein a parent whipped his fifteen-year-old daughter with a belt approximately fifteen times, resulting in a facial laceration and numerous contusions on her buttocks, arms, legs, and shoulder. We held the privilege of parental discipline did not apply because the defendant "cruelly beat his daughter." *Id.* at 142.

[23] In this case, there is no question that Carter was justified in his assessment that some form of punishment was necessary in order to control and deter M.C.'s escalating defiance and dangerous behavior. As to Carter's choice of disciplinary measures, it is apparent that the trial court struggled with ascertaining the line between reasonable and unreasonable force. Prior to imposing a sentence, the trial court remarked to Carter:

> . . . [N]ot only do I believe that you um, had cause[] to discipline her, I do. . . . I also strongly believe that—that kids should be subject to discipline punishment under certain circumstances, I do. I have boys myself. If I had a girl who was posing half necked [*sic*] on social media, I would also be wearing orange because you would not be able to hold me back from her. So, I totally understand why you were as angry as you were, and why you did what you did. Because I'm assuming you were trying to prevent her from living a life you don't want her to live . . . . Which is, getting pregnant at a young age, dropping out of school, getting her[]self physical[ly] assaulted, things like that. I assumed why you did what you did. . . . Um, unfortunately, I think we're in this universe now, where parents don't just get to do whatever they want. And when they make decision[s] like you did, they subject themselves to going to jail for it. I would go

to jail for it, if I thought it was going to help my kids, I really would. Um, and [if] some little girl was posting on my son[']s Facebook page, pictures half necked [*sic*], I probably would be after her too. I think under these circumstances though, I don't know what you['re] supposed to do. I'm not—I can't give you any guidance because I don't know what you do. That girl was as big as you are, she was definite (Phonetic), she probably did look like a clown wearing your shoes, um and I'm not sure what you['re] supposed to do. Because taking away her phone is not going to do the trick. You may have done the trick but you got yourself put in jail doing it. So, I think that um, I think it was over the top but I don't have—I don't have the solution for you. I [am] going to find you NOT GUILTY for [s]trangulation; I'm going to find you GUILTY for [b]attery as a Class A [m]isdemeanor. Giving [*sic*] all of that, I will take everything I heard in consideration during sentencing because I don't—there is not [an] easy solution to this problem. I'm not sure what you do. Cause if you allow them to act that way and they become bad people you get blamed for that too. So, I don't know what you do. . . .

(Tr. pp. 49-50).

[24]  Ultimately, the trial court concluded that Carter's use of force—*i.e.*, at least fourteen strikes with a belt which resulted in significant bruising and lasting pain—exceeded reasonableness, and on appeal, we are mindful of the trial court's role in weighing the evidence and assessing witness credibility to determine whether a parent's actions were justified as reasonable parental discipline. *See Smith*, 34 N.E.3d at 255. Although we are troubled by the lack of clear guidance for parents to be able to distinguish between reasonable discipline and battery, it was the trial court's duty to balance the *Willis* factors, and we decline to reweigh the evidence. Thus, we conclude that there is

sufficient evidence to support Carter's conviction for battery resulting in bodily injury.

## CONCLUSION

Based on the foregoing, we conclude that the State presented sufficient evidence to support Carter's conviction for battery resulting in bodily injury.

Affirmed.

Robb, J. concurs

Crone, J. concurs with separate concurring opinion

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Sauntio Carter,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff* | Court of Appeals Case No.<br>49A04-1511-CR-1823 |

**Crone, Judge, concurring.**

[29] As noted above, "prosecutors and courts are left with the difficult task of determining 'when parental use of physical force in disciplining children turns an otherwise law-abiding citizen into a criminal.'" Slip op. at 6-7 (quoting *Willis*, 888 N.E.2d at 180). I write separately to suggest that our supreme court made that task much more difficult by importing the vague reasonableness standard of the Restatement of Torts into the criminal arena.

[30] When does reasonable punishment become unreasonable? The trial court clearly struggled with this question, as have we at the appellate level. Would thirteen strikes with a belt have been reasonable? Or perhaps fifteen strikes with less bruising and pain? What if Carter had inflicted the same punishment with a rolled-up newspaper? What if M.C.'s transgressions had been slightly more egregious, or what if her brother had witnessed her punishment? With the

possible exception of sentencing, I cannot think of any other area in criminal law that is so fraught with subjectivity. Everyone agrees that a line needs to be drawn, but current caselaw offers little guidance as to where that line is.[4]

[31] There may not be any area where reasonable minds differ more in our current society than corporal punishment of children. Attitudes vary dramatically by and within generations and cultures.[5] If the purpose of the criminal law is to put a person on notice of what conduct is proscribed and what is permitted, then how can one's guilt or innocence depend upon how someone else disciplines his or her children when there is no consensus about what is appropriate?

[32] That being said, courts must step in where legislatures decline to tread, so unless and until the General Assembly enacts clearer guidelines for parental discipline (or our supreme court adopts a more workable standard), trial judges and jurors must rely on their experience and judgment to determine when parents cross over the blurry line that separates lawful from unlawful conduct, and appellate courts must give those determinations significant deference. For

---

[4] The lead opinion cites several reported cases with minor factual differences yet markedly different results.

[5] Some who use the oft-quoted biblical phrase "spare the rod and spoil the child" to justify corporal punishment may be unaware that "the rod" as used in biblical times referred to a shepherd's staff, which was primarily used for redirecting and not striking the flock. A refugee from Myanmar recently relied on a similar biblical passage to justify beating her seven-year-old son with a plastic coat hanger, which resulted in thirty-six bruises. Vick Ryckaert, *Mom cites religious freedom in beating son, pleads guilty*, USA TODAY, Oct. 29, 2016, http://www.usatoday.com/story/news/nation-now/2016/10/28/indiana-religious-freedom-act-defense/92906838/. The woman, who was charged with felony battery and neglect, invoked Indiana's Religious Freedom Restoration Act and "cultural differences" as a defense but ultimately agreed to plead guilty to misdemeanor battery and was sentenced to a year of probation. *Id*.

that reason, I reluctantly concur in my colleagues' affirmance of Carter's battery conviction.

[33]