# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED
Jan 31 2018, 11:06 am
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Ellen M. O'Connor
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Michael Gene Worden
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Tommie R. Shelton, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | January 31, 2018 <br><br> Court of Appeals Case No. <br> 49A05-1708-CR-1878 <br><br> Appeal from the Marion Superior Courts <br><br> The Honorable Anne Flannelly, Magistrate <br><br> Trial Court Cause No. <br> 49G04-1701-F5-1203 |

**Pyle, Judge.**

# Statement of the Case

[1] Tommie Shelton ("Shelton") appeals his conviction, following a jury trial, for Level 5 felony battery resulting in injury to a person less than 14 years of age.[1] He argues that the State produced insufficient evidence to rebut his defense that his actions were protected by parental privilege. Because we conclude that the State produced sufficient evidence to rebut Shelton's defense, we affirm Shelton's conviction.

[2] We affirm.

# Issue

Whether the State produced sufficient evidence to rebut Father's parental privilege defense.

# Facts

[3] Shelton is the father of T.R. ("T.R."), who was born in 2011. Prior to 2017, Shelton and T.R. lived with Shelton's mother, Peggy Shelton ("Grandmother"), for two to two and a half years. However, in January 2017, when T.R. was four years old, Grandmother obtained an eviction order requiring Shelton to move out of her house.

[4] The day before Shelton was required to leave, he and T.R. spent most of the day in the garage packing. Grandmother tried to stay out of their way, but she

---

[1] IND. CODE § 35-42-2-1(c)(1). Shelton was also convicted of Level 6 felony domestic battery, but he does not challenge that conviction on appeal.

did notice that Shelton was acting "a little irritated." (Tr. Vol. 2 at 45). Shelton was "yelling and fussing" at T.R. and began acting "more and more irritated" as the day progressed. (Tr. Vol. 2 at 45). Around 8:30 p.m., Grandmother was walking down the hall and noticed that T.R. had blood on his lip, although she did not see or hear what caused the injury.

[5] Later that night, around 10:00 or 11:00 p.m., Shelton yelled at T.R. because he had not cleaned underneath the bed well enough. T.R. then went to lie down while Shelton continued to pack. At approximately 12:30 a.m., Shelton woke T.R. and told him to go to the laundry room to get his clothes. T.R. got his clothes and headed to the bedroom to put them away. Shelton saw T.R. walking toward the bedroom and yelled "where are you going?" (Tr. Vol. 2 at 52). Shelton then took the belt off of his pants and "started wailing on [T.R.]." (Tr. Vol. 2 at 53). Grandmother saw Shelton hitting T.R. "everywhere the belt could land[.]" (Tr. Vol. 2 at 54).

[6] Initially, Shelton used the strap of his belt to hit T.R. However, T.R. managed to "wiggle between his dad's legs," and Shelton began hitting T.R.'s hands with the belt buckle. (Tr. Vol. 2 at 55). While Shelton was hitting T.R., T.R. screamed and cried. Grandmother yelled at Shelton, telling him to leave T.R. alone, but Shelton told Grandmother to get out of the way and continued to hit T.R. "hard." (Tr. Vol. 2 at 57). Grandmother grabbed T.R. and put him behind her. She then put up her hand to ward off Shelton. He said, "get your hand off me" and pushed Grandmother's shoulders, sending her "flying." (Tr. Vol. 2 at 59). Grandmother fell and hit her right shoulder and head on a door

frame. While she did not pass out, Grandmother felt herself "fade out." (Tr. Vol. 2 at 60). When she got up, she called 9-1-1.

[7] Police officers from the Indianapolis Metropolitan Police Department responded to the scene. One officer observed that T.R. was "quite terrified" and would not make eye contact. (Tr. Vol. 2 at 110). Other officers observed that T.R. had a contusion on his lip, a swollen and bruised hand, and a lump on his head. T.R. also reported that his knee hurt.

[8] On January 10, 2017, the State charged Shelton with Count 1, Level 5 felony battery resulting in bodily injury to a person less than 14 years of age; Count 2 Level 6 felony domestic battery; and Count 3, Class A misdemeanor battery resulting in bodily injury. The State later dismissed Count 3.

[9] During the July 13, 2017 jury trial, Grandmother testified that she believed that, on the night of January 8th, T.R. had started to take his clothes from the laundry room to the bedroom because "he had been trained to put them in [his] drawer." (Tr. Vol. 2 at 52). She testified that between the time when Shelton had yelled "where are you going?" and when he started to hit T.R. with his belt, T.R. had stood in the hallway "half asleep" and "confused" because he had not known where to take the clothes. (Tr. Vol. 2 at 52).

[10] In his closing argument, Shelton argued that his actions were disciplinary in nature, and the trial court instructed the jury on the parental discipline defense. However, the jury found Shelton guilty as charged. The trial court sentenced Shelton to six (6) years with five (5) years executed and one (1) year suspended

on Count 1 and two (2) years executed on Count 2.  It ordered the sentences to be served concurrently for an aggregate sentence of six (6) years.  The trial court further made a domestic violence finding.  Shelton now appeals.

## Decision

[11] On appeal, Shelton argues that the State did not rebut his parental privilege defense beyond a reasonable doubt.

[12] It is well-established that "'[a] parent has a fundamental liberty interest in maintaining a familial relationship with his or her child.'"  *Carter v. State*, 67 N.E.3d 1041, 1044 (Ind. Ct. App. 2016) (quoting *Willis v. State*, 888 N.E.2d 177, 180 (Ind. 2008)), *trans. denied.*  Included within this fundamental liberty interest is the "'right of parents to direct the upbringing and education of children, including the use of reasonable or moderate physical force to control behavior.'"  *Id.* at 1044-45 (quoting *Willis*, 888 N.E.2d at 180) (internal quotes omitted).  However, the State also "'has a powerful interest in preventing and deterring mistreatment of children[,]'" and "'the potential for child abuse cannot be taken lightly.'"  *Id.* at 1045 (quoting *Willis*, 888 N.E.2d at 180).  Thus, prosecutors and courts are left with the difficult task of determining "'when parental use of physical force in disciplining children turns an otherwise law-abiding citizen into a criminal.'"  *Id.* (quoting *Willis*, 888 N.E.2d at 180).

[13] In order to convict Shelton of Level 5 felony battery resulting in injury to a person less than 14 years of age, the State had to prove that he "knowingly or intentionally . . . touch[ed] [T.R.] in a rude, insolent, or angry manner" that

resulted in bodily injury and that T.R. was less than fourteen years of age. I.C. § 35-42-2-1.

[14] The defense of parental privilege, like self-defense, is a complete defense. *Willis*, 888 N.E.2d at 182. That is to say, a valid claim of parental privilege is a legal justification for an otherwise criminal act. *Id. See also* I.C. § 35-41-3-1 ("A person is justified in engaging in conduct otherwise prohibited if he has legal authority to do so"). In order to negate a claim of parental privilege, the State must prove that either: (1) the force the parent used was unreasonable; or (2) the parent's belief that such force was necessary to control his child and prevent misconduct was unreasonable. *Id.* The State may refute a claim of the defense of parental privilege by direct rebuttal or by relying upon the sufficiency of the evidence in its case-in-chief. *Id.* The decision of whether a claim of parental privilege has been disproved is entrusted to the fact-finder. *Id.*

[15] The standard of review for a challenge to the sufficiency of the evidence to rebut a claim of parental privilege is the same as the standard for any sufficiency claim. *Id.* at 182-83. We neither reweigh the evidence nor judge the credibility of witnesses. *Id.* at 183. If there is sufficient evidence of probative value to support the conclusion of the trier of fact, the verdict will not be disturbed. *Id.*

[16] While there "'are no bright-line rules' as to what is considered 'proper and reasonable parental discipline of children,'" the Indiana Supreme Court has adopted the view that "'[a] parent is privileged to apply such reasonable force . . . upon his [or her] child as he [or she] reasonably believes to be necessary for

[the child's] proper control, training, or education.'" *Carter*, 67 N.E.3d at 1045 (quoting *Willis*, 888 N.E.2d at 181-82). In determining whether a punishment is reasonable, we may consider the following factors:

> (a) whether the actor is a parent;
>
> (b) the age, sex, and physical and mental condition of the child;
>
> (c) the nature of his offense and his apparent motive;
>
> (d) the influence of his example upon other children of the same family or group;
>
> (e) whether the force or confinement is reasonably necessary and appropriate to compel obedience to a proper command;
>
> (f) whether it is disproportionate to the offense, unnecessarily degrading, or likely to cause serious or permanent harm.

*Id.* This list of factors is non-exhaustive, and "'not all of the listed factors may be relevant or applicable in every case.'" *Id.* (quoting *Willis*, 888 N.E.2d at 1082).

[17] Here, T.R. was merely four years old and did not do anything reasonably requiring physical discipline. T.R. was sleeping when Shelton woke him at 12:30 a.m. and told him to retrieve his clothes from the laundry room. T.R. retrieved his clothes as Shelton had requested and took the clothes to his bedroom. There was no evidence that, in doing so, T.R. disobeyed a direct order from Shelton. To the contrary, Grandmother testified at trial that T.R. was "half asleep" and confused. (Tr. Vol. 2 at 52). She believed that T.R. took

the clothes to the bedroom because he had been trained to put the clothes away in his drawer.

[18] In addition, Shelton's actions were disproportionate to T.R.'s perceived offense. We have previously held that a parent "'is not privileged to use a means to compel obedience if a less severe method appears to be likely to be equally effective.'" *Carter*, 67 N.E.3d at 1046 (quoting *Willis*, 888 N.E.2d at 1083). In this case, it seems clear that Shelton could have used a less severe method to dispel T.R.'s confusion before resorting to "wailing on [T.R.]" and hitting T.R. "everywhere the belt could land[.]" (Tr. Vol. 2 at 53, 54).

[19] In light of these factors, we conclude that the State produced sufficient evidence to rebut Shelton's parental privilege defense.[2]

[20] Affirmed

Kirsch, J., and Bailey, J., concur.

---

[2] Shelton also seems to argue that there was insufficient evidence that T.R. was injured. Because Shelton admits that an evidence technician observed that one of T.R.'s hands was swollen, there was undisputed evidence of T.R.'s injuries. We will not reweigh the evidence of T.R.'s other injuries; nor will we reweigh the severity of those injuries. *See Willis*, 888 N.E.2d at 183.