NOT DESIGNATED FOR PUBLICATION

No. 124,382

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of I.O. and K.J.,
Minor Children.

MEMORANDUM OPINION

Appeal from Johnson District Court; KATHLEEN SLOAN, judge. Opinion filed April 8, 2022.
Affirmed.

*Dennis J. Stanchik*, of Shawnee, for appellant natural mother.

*Shawn E. Minihan*, assistant district attorney, and *Stephen Howe*, district attorney, for appellee.

Before ATCHESON, P.J., WARNER and HURST, JJ.

PER CURIAM: N.J. appeals the Johnson County District Court's decision to
terminate her right to parent I.O., her daughter, and K.J., her son, and contends the
evidence proved neither that she was unfit nor that any unfitness would persist for the
foreseeable future. Following a two-day termination hearing, the district court credited
testimony and exhibits showing N.J. had placed I.O. in an unwholesome environment
with relatives, had beaten her at least once, and had been repeatedly emotionally abusive
of the child when she was supposed to be working toward family restoration. The hearing
evidence essentially demonstrated N.J. made no substantive progress toward restoring the
family during the two-and-half years this case had been on file. As a result, N.J. was ill
equipped to parent either child and offered no tangible indication she would be able to do
so going forward. We, therefore, affirm the district court.

FACTUAL AND PROCEDURAL HISTORY

The State first interceded in October 2018, when I.O. fled from the home and reported that N.J. had repeatedly struck her with an extension cord. I.O. had physical injuries consistent with the abuse she described. I.O., who was then about 14 years old, told investigators that she had watched N.J.'s live-in boyfriend physically abuse N.J. C.J., the boyfriend, apparently had been released from prison not long before N.J. and the children moved in with him at his mother's house. I.O. also reported that N.J. and C.J. smoked marijuana. I.O. indicated that K.J., her three-year-old half-brother, had likely seen some of that behavior. And I.O. expressed self-destructive impulses she tied to the conditions at home. The State had received a report several months earlier that K.J. had been found wandering unsupervised in the neighborhood.

The State filed this action to have I.O. and K.J. declared children in need of care and for temporary out-of-home placements with legal custody transferred to the Kansas Department for Children and Families. See K.S.A. 2020 Supp. 38-2202(d)(3) (child may be deemed in need of care if he or she "has been physically, mentally[,] or emotionally abused"); K.S.A. 2020 Supp. 38-2202(d)(11) (child may be deemed in need of care if he or she resides with a sibling who has been physically, mentally, or emotionally abused). The district court adjudicated the children to be in need of care and continued their out-of-home placements. The fathers of the children never participated in their lives and have not been active in this case. Their parental rights have been terminated, and neither has appealed.

K.J. was placed with an uncle in Texas and appeared to be doing well there at the time of the termination hearing. I.O. has had a more difficult path. She has been diagnosed with significant psychological problems, and various placements in group settings and otherwise have not been entirely successful. I.O. ran away at least several times and remained in counseling.

A social service agency formulated a family reintegration plan designed to assess N.J.'s needs, to meet those needs through various forms of counseling and guidance, and specifically to strengthen her parenting and coping skills. Because N.J. remained in a relationship with C.J., the plan included tasks for him as someone directly and continually involved with the family.

Early in the reunification process, N.J. tested positive for marijuana and conspicuously avoided and evaded drug testing for the rest of the case. C.J. refused to test ostensibly because he was being tested as a condition of his release from prison, but he never produced or made available any test results. See *In re P.L.*, No. 120,220, 2019 WL 2063874, at *3 (Kan. App. 2019) (unpublished opinion) (court may reasonably infer continuing illicit drug use based on parent's positive test or admission coupled with "deliberate and ongoing avoidance of drug testing").

More broadly, C.J. proved to be a disruptive force in the agency's efforts to pull the family back together. He repeatedly challenged and argued with the service providers. He often chose to do so during what were supposed to be structured visits with K.J., materially detracting from those sessions. Eventually, C.J. was prohibited from attending some of those and other sessions conducted as part of the reunification process. Caseworkers testified they believed C.J.'s obstreperousness and lack of cooperation influenced N.J. to behave similarly, if less antagonistically.

In short, C.J. appeared to inhibit N.J.'s willingness to undertake tasks necessary for successful family reunification. At several points in the process, N.J. represented that she had separated herself from C.J. But he consistently reappeared and remained an integral part of the reunification plan and process. Eventually, the caseworkers suggested to N.J. that reintegration would be difficult if she remained in a relationship with C.J. During these proceedings, N.J. and C.J. had a child together. Their child is not directly involved

in this case and apparently has been placed in a guardianship with C.J.'s mother and mother's ex-husband.

The agency's reintegration plan called for N.J. to participate in individual counselling as a prelude to some form of joint counselling with I.O. N.J did so briefly and unsuccessfully. She later claimed she met with a counsellor through another agency but never provided the requested verification.

Although I.O. regularly met with a therapist, she adamantly refused to participate in structured visits with N.J. I.O.'s therapist said visits would be counterproductive and discouraged any meetings, at least until N.J. had made substantial progress in her individual therapy. The hearing evidence established that N.J. had left I.O. with two of her uncles when she was younger. In that setting, I.O. witnessed prostitution and drug use on a regular basis. I.O.'s therapist suggested that would have been traumatic for any child. Several times during this case, N.J. directed social media communications to I.O. that can be fairly characterized as belittling and abusive. We need not recite their content here. N.J. and C.J. also asked caseworkers several times if they might regain custody of K.J. if N.J. voluntarily relinquished her parental rights to I.O.

N.J. never secured a suitable residence to accommodate her children—another component for successful reintegration. For the most part, N.J. lived in the home of C.J.'s mother. N.J. represented she had a residence in Missouri, but caseworkers were unable to verify she had actually leased a place or that it would be appropriate for the children. Likewise, N.J. claimed to have gainful employment—also a requirement for reintegration—but never provided caseworkers with payroll records or other verification of the work.

During the termination hearing in June 2021, the caseworkers basically said that N.J. had taken virtually no concrete steps toward family reunification and was no more

able to parent I.O. and K.J. than she was when the case began in October 2018. During that time, K. J. had been out of the home and had only limited contact with N.J.—a period representing a large portion of his life. I.O. also had been out of the home with virtually no approved interactions with N.J.

The district court entered a nine-page memorandum decision on August 11, 2021, finding N.J. to be presently unfit to parent I.O. and K.J. and finding her unfitness was unlikely to change in the foreseeable future. See K.S.A. 2020 Supp. 38-2269(a) (to support termination, district court must find parent unfit and conditions unlikely to change). The district court also found that the best interests of the children would be advanced by terminating N.J.'s parental rights. See K.S.A. 2020 Supp. 38-2269(g)(1) (best interests of child must favor termination). N.J. has appealed.

LEGAL ANALYSIS

*Governing Legal Principles*

A person has a constitutionally recognized right to a parental relationship with his or her child. See *Santosky v. Kramer*, 455 U.S. 745, 753, 758-59, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *In re B.D.-Y.*, 286 Kan. 686, 697-98, 187 P.3d 594 (2008) (citing *Santosky*). The right is a constitutionally protected liberty interest. See *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000) (substantive liberty interest); *Pierce v. Society of the Sisters*, 268 U.S. 510, 534-35, 45 S. Ct. 571, 69 L. Ed. 1070 (1925) (recognizing "the liberty of parents and guardians to direct the upbringing and education of children under their control"). Accordingly, the State may extinguish the legal bond between a parent and child only upon clear and convincing proof of parental unfitness. K.S.A. 2020 Supp. 38-2269(a); *Santosky*, 455 U.S. at 769-70; *In re R.S.*, 50 Kan. App. 2d 1105, Syl. ¶ 1, 336 P.3d 903 (2014). The Legislature has enacted the Revised Kansas Code for Care of Children, K.S.A. 2020 Supp. 38-2201 et seq., to codify

5

processes for finding children in need of care, for fostering family reunification, and for terminating parental rights if those efforts fail.

After a child has been adjudicated in need of care, a district court may terminate parental rights "when the court finds by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for the child and the conduct or condition is unlikely to change in the foreseeable future." K.S.A. 2020 Supp. 38-2269(a). In considering a parent's unfitness, the district court may apply the factors outlined in K.S.A. 2020 Supp. 38-2269(b) and, when the child has been removed from the home, the additional factors in K.S.A. 2020 Supp. 38-2269(c). In this case, the district court drew from both of those sources to find N.J. unfit. A single factor may be sufficient to establish unfitness. See K.S.A. 2020 Supp. 38-2269(f).

In gauging the likelihood of change in the foreseeable future under K.S.A. 2020 Supp. 38-2269(a), the courts should use "child time" as the measure. As the Code recognizes, children experience the passage of time in a way that makes a month or a year seem considerably longer than it would for an adult, and that difference in perception typically tilts toward a prompt, permanent disposition. K.S.A. 2020 Supp. 38-2201(b)(4); *In re M.B.*, 39 Kan. App. 2d 31, 45, 176 P.3d 977 (2008); *In re G.A.Y.*, No. 109,605, 2013 WL 5507639, at *1 (Kan. App. 2013) (unpublished opinion) ("'child time'" differs from "'adult time'" in care proceedings "in the sense that a year . . . reflects a much longer portion of a minor's life than an adult's").

When the sufficiency of the evidence supporting a decision to terminate parental rights is challenged, an appellate court will uphold the decision if, after reviewing the record evidence in a light most favorable to the State as the prevailing party, the district court's findings on unfitness and foreseeability of change are supported by clear and convincing evidence. Stated another way, the appellate court must be persuaded that a rational fact-finder could have found it highly probable that the circumstances warrant the

termination of parental rights. *In re B.D.-Y.*, 286 Kan. at 705. In evaluating the record, the appellate court does not weigh conflicting evidence, pass on the credibility of witnesses, or determine factual questions. *In re Adoption of B.B.M.*, 290 Kan. 236, 244, 224 P.3d 1168 (2010); *In re M.H.*, 50 Kan. App. 2d 1162, 1170, 337 P.3d 711 (2014).

The district court's best interests determination is governed by a less stringent standard. As directed by K.S.A. 2020 Supp. 38-2269(g)(1), the district court should give "primary consideration to the physical, mental[,] and emotional health of the child" in making a best interests finding. A district court decides best interests based on a preponderance of the evidence. See *In re R.S.*, 50 Kan. App. 2d at 1115-16. The decision essentially rests in the district court's sound judicial discretion. 50 Kan. App. 2d at 1116. An appellate court reviews those sorts of conclusions for abuse of discretion. A district court exceeds that broad latitude if it rules in a way no reasonable judicial officer would under the circumstances, if it ignores controlling facts or relies on unproven factual representations, or if it acts outside the legal framework appropriate to the issue. See *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 935, 296 P.3d 1106 (2013); *In re M.S.*, 56 Kan. App. 2d 1247, 1264, 447 P.3d 994 (2019).

*Legal Principles Applied*

The district court identified four statutory bases in finding N.J. presently unfit to parent both children and a fifth basis regarding I.O. Consistent with N.J.'s challenge on appeal, we look at the evidence supporting those grounds, filtered through the requisite standards of review.

The district court found N.J. unfit under K.S.A. 2020 Supp. 38-2268(b)(7) as to both children based on the failure of reasonable efforts by the social service agency "to rehabilitate the family." Because the children had been in placements out of the home for more than 15 months, the district court also considered and found N.J. unfit under K.S.A.

7

2020 Supp. 38-2269(c)(3) for failing to carry out a reasonable plan to restore the family unit. Those two measures of unfitness functionally track the same circumstances.

Without repeating what we have already outlined, the evidence showed the agency's family reintegration plan failed on virtually every front. The plan itself contained typical components designed to address the deteriorated psychological and emotional relationship between N.J. and I.O., to monitor and curtail apparent illegal drug use on N.J.'s part, and to achieve suitable housing and sufficient income to maintain the family. In short, the agency set up avenues leading to the goal of reunification. The evidence the district court appropriately credited demonstrated N.J. was unable or unwilling to do much of anything to work toward the ultimate goal. Her relationship with C.J. appears to have been a substantial and toxic impediment in that respect.

On appeal, N.J. suggests C.J. exerted an undue influence over her, leading to many of the negative outcomes on specific tasks promoting reunification and the overall failure of the process. Although that may be an explanation, it is not an excuse that relieves N.J. of her obligations in a child-in-need-of-care proceeding. The agency undertook appropriate steps here and was met with a wall of passive and sometimes active resistance. The circumstances establish unfitness, as the district court found. See *In re M.S.*, 56 Kan. App. 2d at 1257-58.

The district court also found N.J. to be unfit as to both I.O. and K.J. because of her lack of effort to adjust her circumstances to meet the needs of the children under K.S.A. 2020 Supp. 38-2269 (b)(8). Here, this ground of unfitness is closely allied with the failure of the agency's family rehabilitation plan. Again, without repeating the evidence, N.J. did little or nothing to change what she was doing to meet the needs of the children. She did not seek out and obtain suitable housing or employment. She cut short her individual counselling. And she continually evaded required drug testing. The evidence supports the district court's determination.

8

As to I.O., the district court found N.J. unfit because of her emotional neglect or abuse of the child, as provided in K.S.A. 2020 Supp. 38-2269(b)(4). The evidence showed N.J. was aware that when she left I.O. with relatives, the child was exposed to conduct and behaviors associated with prostitution and drug abuse that would be deleterious. The decision reflected both emotional neglect and remarkably poor judgment. During these proceedings, N.J. communicated pernicious and emotionally abusive messages to I.O. through social media. That conduct demonstrated unfitness, especially given I.O.'s psychological fragility—something N.J. knew perfectly well. The district court's finding is amply supported.

Finally, the district court found N.J. unfit as to both children based on her "failure to maintain regular visitation, contact[,] or communication" with the children under K.S.A. 2020 Supp. 38-2269(c)(2), given their extended out-of-home placements. We question whether the evidence on this point necessarily met the clear and convincing standard. But we need not decide the issue because the other bases the district court recognized had strong foundations in the evidence and were more than legally sufficient to warrant the conclusion N.J. was unfit at the time of the termination hearing. N.J. had no visits or other approved communication with I.O. based on the professional recommendation of the child's therapist. Whether that qualifies as an active failure on N.J.'s part could be debated. And N.J. had regular, though tightly controlled, visits with K.J. that sometimes did not go particularly well.

N.J. also challenges the sufficiency of the evidence supporting the district court's conclusion that her unfitness was unlikely to change in the foreseeable future. As we have mentioned, the measure of foreseeability is "child time." Here, child time is probably different for I.O., as a teenager, than it is for K.J., as a preschooler. But any difference is immaterial, given the evidence. N.J. had about two and half years between the time the children were taken into state custody and the termination hearing to attempt

9

family reintegration. As we have said, the record shows that N.J. did little over that extended period to improve her circumstances in ways that would promote the return of her children. This case did not even fit a recurrent scenario in which a lackadaisical parent suddenly turns dutiful in the last few months ahead of a termination hearing. On appeal, N.J. ineffectively seeks to excuse her miniscule effort because of C.J.'s negative influences. But the district court reasonably concluded N.J. presented nothing to suggest she would do better going forward, especially given C.J.'s continuing presence in her life.

Although N.J. does not directly address the children's best interests as an issue on appeal, we consider the point as a matter of completeness. There is little question I.O.'s best interests lay in terminating N.J.'s parental rights. N.J. made demonstrably poor judgments in parenting I.O. leading up to the filing of this case. During the case, N.J. did nothing of substance to improve the parent-child relationship. Rather than try to repair the frayed emotional tether she may have had with I.O., N.J. sought to further rupture the relationship with her social media messaging. Moreover, N.J. and C.J.'s suggestions to the caseworkers that effectively sought to barter away I.O. to secure the return of K.J. underscore the sufficiency of the district court's determination.

As to K.J., the evidence may not be as stark. But he had been out of N.J.'s custody for much of his life and was residing with a blood relative in what appeared to be a nurturing home. N.J. failed to secure even the physical structures—housing and means of financial support—fostering such an environment. And the prospects were dim that N.J. would do so at some readily discernible point on the horizon. Even putting aside N.J.'s questionable ability to meet the emotional needs of a young child, K.J.'s best interests were advanced through the stability he realized in the placement with his relative. See *In re C.H.*, No. 123,640, 2021 WL 4932044, *8-9 (Kan. App. 2021) (unpublished opinion). *In re T.E.B.*, No. 119,535, 2018 WL 6253400, *4 (Kan. App. 2018) (unpublished opinion). We find no abuse of judicial discretion in the district court's determination of the best interests of either I.O. or K.J.

Affirmed.