# Supreme Court of Texas

No. 19-1069

In the Interest of J.W., a Child

On Petition for Review from the
Court of Appeals for the Tenth District of Texas

**Argued September 15, 2021**

JUSTICE YOUNG, concurring.

Three vigorous opinions—the detailed opinion of the Court and two dissents—debate the resolution of Father's appeal in this parental-rights-termination case. The Court reverses the termination and remands for a new trial. One dissent argues that the Court has not gone far enough; the other contends that the Court has gone too far.

On the surface, these contending opinions suggest that the Court is hopelessly divided. My additional separate writing does not aim to deepen the seeming division with yet a *fourth* approach. Quite the opposite: I write to suggest that the disagreements are largely (not entirely, but largely) limited to the outcome of this single case. Thus, while I join the Court's opinion and its judgment, I also agree with much of the legal analysis in both dissents. Indeed, I see nothing in the Court's opinion that contradicts the positions that our dissenting colleagues put

forth with such vigor.

My purpose, therefore, is to enumerate several core principles that I believe emerge from this case's various opinions. These eight principles are of great importance for the many other cases that involve whether parental rights may be terminated.

*First*, I begin with the premise that our law recognizes the parent-child relationship as sacred: "This natural parental right [is] a basic civil right of man[] and far more precious than property rights." *In re A.M.*, 630 S.W.3d 25, 25 (Tex. 2019) (Blacklock, J., concurring in the denial of review) (quoting *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985)). No wonder, therefore, that governmental interference in that relationship faces scrutiny and limits under the U.S. Constitution and our State's Constitution and statutes.[1] Most parents would gladly give their lives for their children; many, alas, have had to do so. Most parents would also stake their lives on what the U.S. Supreme Court has called "the right, coupled with the high duty," to oversee their children's growth and development. *Pierce v. Society of Sisters*, 268 U.S. 510, 535 (1925).

*Second*, however, the very sanctity of the parent-child relationship entails the need for an escape hatch if things go terribly wrong. Parents typically can be counted on to move heaven and earth to protect their children, which is a key reason that parental relationships warrant such respect. Who could better judge what serves a child's best interests than

---

[1] *See, e.g.*, *Troxel v. Granville*, 530 U.S. 57, 72 (2000) (holding that a fit custodial parent has a fundamental right concerning the "care, custody, and control" of her children); *In re C.J.C.*, 603 S.W.3d 804, 806–08, 811–14 (Tex. 2020) (describing federal and Texas authorities that address parents' fundamental rights to direct their children's upbringing).

a fit parent?  For this reason, breaching the ancient obligation that a parent has to a child is among the most serious breaches of trust imaginable.  When such a violation is proven, the law deems a parent to have renounced his or her status as a parent.[2]  The average Texan would be shocked by the tragic volume of such cases that our courts see.

Said another way, parents are immeasurably better equipped than any bureaucracy to order their children's affairs.  But when a parent crosses a line—defined through legislative enactments pursuant to constitutional limitations and upon a jury's finding—the courts will recognize that a parent has relinquished his entitlement to the honor of the rights of parenthood.  Such a change in status is never anything less than a tragedy, but our society recognizes that it is sometimes necessary.

*Third*, one parent's rights may not be terminated for another's failure.  In this case, the joint trial of Father and Mother may well have made it difficult for the jury to fully distinguish between the two parents.[3]  On remand, Mother will not be a co-defendant; she has allowed the judgment that terminated her parental rights to become

---

[2] It is not easy to prove such a breach.  *See ante* at 21 (describing the heightened burden of proof and standard of review required to terminate parental rights).  Every benefit goes to the accused parent, which risks subjecting a child to someone unfit to care for her.  But it also protects her by ensuring that she will not wrongly be deprived of a relationship with a fit parent.  Thus, only the *truly* unfit will be subject to what Justice Lehrmann has aptly called "the 'death penalty' of civil cases."  *In re K.M.L.*, 443 S.W.3d 101, 121 (Tex. 2014) (Lehrmann, J., concurring).

[3] To be clear, the joint trial was not itself a ground for a reversal—other errors provide the basis for today's decision.  But the remand for a trial of Father alone will have the salutary consequence of ensuring that he is judged on his own, and not tarred with Mother's sins.

final. Mother's problems will be refracted through a far different lens this time around—not whether those problems exist, but whether Father can adequately protect J.W. from any threat posed by Mother. The focus will be *on Father*. It is one thing if Father cannot protect J.W. from Mother; but *Mother*'s inability to protect J.W. will no longer be a central question.

Thus, Mother will hardly be irrelevant in the new trial, but neither will her inadequacies dominate it. The trial court should be careful to ensure that Father's rights—and his duty to J.W.—are not invaded on account of Mother's failings. As Justice Blacklock puts it, Father "should not lose his son because of his wife's failings," and "it is Father's rights at stake, and he must be judged by *his* actions, not *hers*." *Post* at 2, 25.

*Fourth*, neither the State nor the courts may penalize one spouse for assisting the other or taking the other's side, as long as such otherwise-praiseworthy conduct does not harm the child. In this case, Father clearly went to great lengths to help Mother. He appears to have repeatedly turned the other cheek and seems desperately to have wanted the best for Mother, including her restoration to full physical and mental health. Even if his choices were not always wise, they seem largely to have flowed from a genuine desire to maintain a united family and to serve his wife as any husband should. Surely it would be better, as a general matter, if more spouses sought to honor their promises to each other, even in arduous circumstances that present dilemmas that none of us would wish to face.

In any event, it is not for the government to instruct married couples about their relationships. Our law also regards the matrimonial

4

bond as sacred. One spouse generally cannot be compelled to testify against the other even in aid of criminal prosecution. Tex. R. Evid. 504. But this principle, too, has its legal limits—and not just in Rule 504's exceptions. As relevant here, some probative evidence could have allowed the jury to conclude that Father's support for his wife—a virtuous intention—nonetheless trespassed into his duties to J.W.

The only relevant question, though, remains whether Father could (and did) *protect J.W.*, not whether Father was more pliant in his attempts to aid his wife than the government might like. It is crucial that these questions remain wholly distinct. On remand, I am confident that the court will not allow confusion of the two points, and indeed will ensure that the focus remains on the former, not the latter.

*Fifth*, and relatedly, the government does not and may not advocate, seek, prefer, or reward divorce. Some testimony in the record may suggest, at least when read in isolation, that the State's agents were *disappointed* at the thought of the marriage surviving. It is worth restating another ancient principle: Divorce is an evil—one that our law allows in recognition of adults' freedom to make their own choices, and one that sometimes may be inevitable in light of the frailties of human nature. Occasionally it may even be the far lesser evil. But it is never something to celebrate or encourage. Justice Blacklock reads the record as reflecting that the government sometimes "expects people to sever their bonds of marriage in order to prove their 'protectiveness.'" *Post* at 19. His reading of the record is by no means baseless. One true benefit of a new trial is the assurance that no whiff of such an attitude will be repeated. The Court in no way endorses any such position, here or

5

elsewhere.[4]

I conclude that the government's position—despite some unfortunate articulations of it—did not cross the line. As I understand the record, there is some confusion about whether the divorce between Father and Mother was genuine. The parents' purported divorce was at least arguably an effort to distract from what the State *should* legitimately address—the obligation to keep J.W. safe. Any doubt about what the government may legitimately target should be dispelled. Father has *never* had any obligation to divorce Mother. His obligation, in defending himself in a parental-rights-termination case, is to show that his child will be safe. If Father cannot show his ability to ensure J.W.'s safety while being married to (or otherwise associated with) Mother, and if Father then uses a *purported* divorce to persuade the government and the courts that the risk to J.W. has disappeared, then his *lie* about divorce is quite relevant to the true issue—J.W.'s safety. *See ante* at 27 & 27 n.10.

Here, the concern was that Father would be unable "to tell [Mother] no" and thus prevent J.W.'s exposure to all the things that follow from that inability. Demanding divorce exceeds the government's authority—but if there was a *lie* about divorce that sought to cover such an inability, the lie is not something that a jury would have to ignore or that we should excuse.

---

[4] Even aside from the historic respect that the institution of marriage generally warrants under our law, in the *child-protection* context, there are reasons to think (with full recognition of unfortunate exceptions) that successful outcomes for children are more likely to follow from preserving their parents' marriages when possible. *See, e.g.*, Bram Hogendoorn, et al., *Divorce and Diverging Poverty Rates: A Risk-and-Vulnerability Approach*, 82 J. Marriage & Family 1089 (2020).

*Sixth*, as the Court properly acknowledges,[5] the courts must hold the bureaucracy in check. Bureaucratic decisions premised on arbitrary or improper considerations *always* pose risks. But the stakes here—the future of small children and of families—are dramatically higher than in most administrative cases, and the courts must subject the State's contentions to *genuine* scrutiny rather than the scrutiny of the rubber stamp. Nothing in any opinion today retreats from our longstanding commitment to elevated thresholds of proof and judicial review.[6]

*Seventh*, jury verdicts are entitled to basic respect because they provide another check on improper terminations. The use of the jury, which is instructed to follow stringent requirements of proof, is yet another protection for the parent. But the jury's authority requires us also to accept the standard of review in which the evidence must be seen in a light favorable to the verdict. Thus, while I again agree with much of Justice Blacklock's eloquent dissent and find his presentation of the record to be very persuasive, I cannot agree that the evidence summarized by the Court is utterly incapable of supporting the verdict.

But the Court's disposition *favors* Father—it properly insists that Father have a chance to make his case to a new jury in a proceeding

---

[5] *See, e.g., ante* at 36 ("We certainly do not condone or make light of the potential . . . for the Department to summarily dismiss all kinship placement options in a 'quest to punish a parent' rather than serve the best interest of the child. Such behavior threatens to unjustifiably invade a parent's due process rights and would violate both federal and state law.").

[6] *See also, e.g., In re A.M.*, 630 S.W.3d 25, 26 (Tex. 2019) (Blacklock., J.) (concurring in denial of review) (cautioning against use of improper evidence as basis to interfere with parental rights); *In re E.R.*, 385 S.W.3d 552, 555 (Tex. 2012) (reversing court of appeals' judgment for failing to show that parent had constitutionally adequate notice of proceedings).

shorn of the errors that infected his first trial. This is part of why I believe that the distance between the Court and Justice Blacklock—while certainly real—is not as great as it might first seem. Indeed, Justice Blacklock recognizes today's decision as "a victory of sorts for Father," even as he concludes that Father "is entitled to more." *Post* at 2. Perhaps even the government will conclude that a new trial is not needed. Either way, though, in light of the evidence presented at trial, the "victory" that Father has won is as much as we are authorized to afford him.

*Eighth*, the law is not blind to how a father treats the unborn, and a father's conduct before a child's birth may well justify (or help in justifying) the termination of his parental rights. I thus largely agree with the premise of Justice Boyd's dissent. But at the same time, to subject Father to the loss of his parental rights based on what happened during the pregnancy would require far more than the record here shows. Father's unwillingness or inability to *control Mother* during her pregnancy is different in kind from the sort of affirmative acts of harm toward either a mother or child during pregnancy that would justify terminating his rights on that ground. I agree with the Court, *ante* at 30, and Justice Blacklock, *post* at 27 n.22, that Justice Boyd's bottom-line conclusion is mistaken in this case, even if there is general agreement that the law may and indeed should hold a father accountable for conduct before his child's birth. Indeed, Father seems to have genuinely desired his wife to be free of the scourge of drugs and appears to have done everything he could, following his best lights, to help her. But it was Mother, and not Father, who made the relevant choices.

Justice Boyd does not stand alone in seeing the law's protection

8

of children—or its demands on the obligations of parents—to reach the period before a child's birth, in other words. He only stands alone (as far as I can see) in thinking that *in this case* a reasonable juror could have concluded that Father's conduct during the pregnancy rose to the extreme level warranting termination under both grounds D and E (the latter of which the Court need not even reach). But a disagreement on the legal sufficiency of the evidence in a given case does not equate to a disagreement on the core legal principle that governs all cases.

\* \* \*

Father should take "yes" for an answer. He is getting everything he ought to get—a trial that is free from unfair taint (he will be tried alone, as Mother's termination is final); a trial that is free from legal error (he will receive granulated questions so that the courts may ensure that a verdict relies on sufficient evidence); and a trial in which he may freely put forth (or rebut) evidence to defeat the State's case. *Ante* at 44.

With these observations, I join the Court's opinion and judgment, confident that the law is simultaneously protecting parental relationships *and* ensuring that the courts may act if the obligation that a parent has to a child falls below what the law requires.

Evan A. Young
Justice

**OPINION DELIVERED:** May 27, 2022

9